The KROGER COMPANY, Plaintiff,

v.

CHIMNEYVILLE PROPERTIES, LTD. and Jefferson–Pilot Life Insurance Company, Defendants.

Civ. A. No. J90–0378(L).

United States District Court, S.D. Mississippi, Jackson Division.

Nov. 19, 1991.

P.N. Harkins, III, Watkins & Eager, Jackson, Miss., for plaintiff.

William H. Glover, Jr., John E. Hughes, III, Jackson, Miss., for Jefferson-P Life Ins. Co.

Erwin C. Ward, Jackson, Miss., Kenneth R. Hall, Herring, Long & Joiner, Canton, Miss., for Chimneyville Properties, Ltd.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This case was tried to the court sitting without a jury and the court, having considered the testimony of witnesses and documents admitted in evidence makes the following findings of fact and conclusions of law.

Kroger entered into a lease agreement and memorandum lease with Sunflower Development Company dated November 22, 1978 covering certain land and property located in Robinson Road Plaza Shopping Center on Robinson Road in Jackson, Mississippi. The primary term of the lease agreement was twenty years, beginning November 22, 1978 and ending July 31, 1999, to be followed by options to renew for five-year terms. Kroger was to pay a monthly rental of $12,907.92, plus a percentage of its annual sales above a designated level of gross receipts. Pursuant to the terms of the lease agreements, Sunflower constructed an approximately 30,000 square foot grocery store facility according to Kroger's plans and specifications. Construction of the facility was financed by a loan of $915,000 from Jefferson Standard Life Insurance Company, the predecessor in interest of Jefferson–Pilot Life Insurance Company (Jefferson–Pilot). The loan was evidenced by an April 1, 1980 promissory note and secured by a deed of trust in favor of Jefferson Standard covering the land and property, and was further secured by an assignment of leases to Jefferson–Pilot, also dated April 1, 1980. On October 24, 1979, the lease agreements were assigned by Sunflower to Chimneyville Properties, Ltd. (Chimneyville) and Chimneyville assumed the debt to Jefferson–Pilot.

Kroger operated a retail grocery establishment on the property beginning in 1980,

but sales were not as anticipated and the store became unprofitable which culminated in Kroger's vacating the facility in December 1986. The parties had envisioned at the outset of their relationship the commercial development of a shopping center on the premises, for which the Kroger store was to be an anchor facility. However, the parties' hopes and expectations did not materialize. Despite Chimneyville's efforts to secure satellite tenants, Kroger was the sole tenant at the time it vacated the premises. Further contributing to the unprofitability of the Kroger store was the expansion of a nearby Jitney Jungle grocery store and the opening of a County Market grocery store about a mile from the Kroger location.

After Kroger left the premises in December 1986, the property remained vacant for a period of years. Throughout this time, Kroger and Chimneyville endeavored to locate a subtenant for the facility,[1] and Kroger continued to pay its monthly rental to Chimneyville. The first solid prospect, an individual by the name of J.L. Holloway, was found in the early part of 1990. However, during late 1989 and early 1990, a dispute arose between Kroger and Chimneyville with regard to certain maintenance and repairs which Kroger alleged that Chimneyville, in derogation of its contractual obligations, had not performed. As a result of this dispute, Kroger filed this lawsuit on July 31, 1990 against Chimneyville and Jefferson–Pilot. Kroger seeks in this action a declaratory judgment that as a result of Chimneyville's breach of the lease agreements, the leased premises has become untenantable, uninhabitable and unfit for the purpose for which it was leased, resulting in a constructive eviction and, impairment of the consideration for the lease agreements. Kroger further seeks a declaratory judgment that the lease agreements are terminated and cancelled without any further liability on the part of Kroger, and a judgment awarding damages for defendants' alleged breach or, alternatively, a judgment enjoining defendants to complete all reasonable and necessary repairs and improvements to the leased premises. Since the filing of this action, Kroger has paid the monthly rental payments into the registry of the court.

Chimneyville has filed a counterclaim against Kroger charging that as a result of Kroger's having vacated the premises and having thereafter failed to take reasonable steps to protect and care for the premises, which remained within Kroger's exclusive legal possession and control, Chimneyville was caused to incur increased casualty insurance costs, and administrative and repair costs which should be borne by Kroger. Chimneyville further charges that permanent structural damage to the premises was caused by Kroger's negligence for which it should respond in monetary damages. Chimneyville seeks a return of all monthly rental payments which have been paid into the registry of the court following Kroger's filing of this action. Finally, Chimneyville requests an adjudication that the lease agreements remain in effect and that Kroger is hereafter responsible to take steps to protect the vacant leased structure from permanent waste during the remaining lease term.

The evidence adduced at trial showed that within six months of the time Kroger vacated the leased premises, the property became the target of vandals. Robert Baumgartner, Kroger Marketing Area Real Estate Manager, wrote to Ray Blake, Chimneyville's director of properties, on June 11, 1987 that the building had been defaced by a large amount of grafitti. He stated that Kroger had been trying without success to find a user for the building and requested Chimneyville's cooperation in having the grafitti removed, explaining the need to keep the premises attractive and clean so that it would be appealing to prospective tenants. There was no further communication concerning the premises until over a year later when Keith Rudemiller, who had assumed Baumgartner's responsibilities over the property, on July 25, 1988,

---

1. Kroger contacted numerous public agencies, including a food bank, Jackson State University, the postal service and the state welfare department. It sent out a mass mailing to try to find a tenant but was unsuccessful.

wrote to Blake describing the findings of Charles Lunsford, an employee of Kroger's facility engineering department, upon an inspection of the property:

> [S]everal items ha[ve] been removed (apparently stolen) from the roof of the building. Among these items were six penthouse covers, four fiberglass exhaust fan butterfly lids, and one vent exhaust assembly over the restrooms. As a courtesty to you, we wanted to inform you of the types of things that are happening to this property. We want to suggest that it may be a good idea for you to personally inspect this property to see first-hand what is happening to it. The graffitti [sic] on the wall is uncontrollable. Fires have been started against the rear wall of the building. Bricks and blocks have been torn from the walls where holes now exist. We have had to install sheet metal on parts of the roof to keep the vandals and thieves from entering the building. We felt you should be aware of the latest destruction to this facility, so that you can do whatever is necessary to protect your investment.

Rudemiller explained in his testimony that though Kroger viewed the vandalism damage as Chimneyville's responsibility under the lease, Kroger did not know how long it might take Chimneyville to respond with repairs, so Kroger, because it still had equipment in the building, covered the entry points to protect its property and equipment. Chimneyville, in accordance with Kroger's request, painted over the grafitti and additionally, erected an eight-foot chain link fence around the perimeter of the building to dissuade further acts of vandalism.

Approximately a year later, in the spring of 1989, Kroger wrote to Chimneyville concerning damage to the parking lot of the premises as well as to a light pole caused by a driving school which had used the parking lot for driving instruction, without consent or permission. Chimneyville repaired the light pole and patched the parking lot. Additionally in the summer of 1989, Charles Lunsford reported that vandals had knocked another hole in the structural wall which, Lunsford said, was "large enough for a man to walk through."

Several months later, on November 22, 1989, Rudemiller again wrote to Chimneyville concerning the premises. He insisted that Chimneyville perform repairs to the parking lot, and further advised that the chain link fence around the building had been knocked down, and the rear of the building had become a dumping ground for automobile tires, with several hundred having been accumulated. He stated, however, that the most serious problem involving the premises were large cracks and separations occurring along two places in the front wall, which seemed to be growing wider by the month. He requested that Chimneyville immediately investigate the situation "before the damage to the building [became] irreversible." Rudemiller's letter was followed a week later by photographs depicting the conditions described in his letter. Chimneyville responded by caulking the cracks in the face of the building.

On January 11, 1990, Wesley Wall, then Superintendent of the City of Jackson's Water Maintenance and Distribution Department, was notified that water was flowing down Robinson Road near the location of the vacant Kroger store. When he arrived at the premises, he saw water flowing out of the building, across the parking lot and down Robinson Road. Johnny Phillips, the department's commercial meter service man, was dispatched to the building to turn off the water at the meter. Phillips also saw water flowing out of the building and across the parking lot. When Phillips turned the meter off, the water flow stopped. The water department's dispatcher notified someone with Kroger of this incident and the fact that the water service had been shut off.

Rudemiller wrote to Chimneyville again on February 16, 1990 concerning additional repair and maintenance items of which he thought Chimneyville needed to be made aware. Rudemiller told of a new crack in the western side wall of the store, which ran from the roof to the ground, and advised that one of the cracks in the front

wall appeared to have widened significantly since his November 1989 letter. He stated that since under the terms of the lease agreements a portion of Kroger's monthly rental was to be applied toward common area maintenance,

> we must again request that the trash, discarded tires and bedding behind the store, and weeds along the eastern wall all be removed, and periodically maintained. We must improve this property's appearance if we are to have any success in our attempts to sublet this facility. Finally, when I visited the facility on February 8, 1990, I found the gate to the fence surrounding this store to be impassable due to its being tied to the fence with several plastic strips. Although there have been problems with vandalism of this property, we must have access to the building if we are to be able to inspect it or show it to prospective subtenants. I trust you will look into these matters immediately.

After receiving Rudemiller's February 16 letter, Kerry Heinz, a Chimneyville principal, employed a structural engineer, William Wardlaw, to view the cracking in the walls and to render an opinion as to the cause of the problem. Wardlaw visited the site on February 22, 1990 and provided a report concerning his findings and opinion. In his report, Wardlaw expressed that the building was located in an area where the highly expansive Yazoo clays are usually encountered in the near surface soil strata and then, after explaining that the introduction of water into the clays causes movement, and after identifying potential sources of water, opined that

> the large crack in the front wall is a result of heaving in expansive soil beneath the building. It is most probable that water is being introduced to these soils by a broken water or sewer line. All utility lines in this part of the building need to be inspected and all leaks repaired. The water entering the building through roof leaks, etc. and the leaking gutters are also potential problem sources. These deficiencies should be

corrected once the problem source has been identified and corrected. The appropriate repairs should then be made to the front wall.

On March 23, 1990, Kerry Heinz travelled to Jackson to inspect the building. Heinz, who had been made aware of the fact that water had been flowing from the building on January 11, was met at the building on March 26 by Ken Strain, Chimneyville's maintenance man, Stewart Barry, a realtor, who had been hired by Kroger to locate a subtenant as well as by Chimneyville to find a buyer,[2] Lomax Anderson, president of the company which had originally constructed the building and which had performed repair work on behalf of Chimneyville, and Johnny Phillips, the water department employee who had turned the meter off. At Heinz's request, Phillips turned the water meter back on so that it could be determined if water leaks had occurred within the building which might have caused the reported structural damage. When Phillips turned the meter on, water could be heard running in the building. According to a interoffice memo prepared by Heinz on March 27, 1990, there was discovered on inspection a leak in a two-inch pipe where Kroger had removed a freezer from the deli area of the store. Heinz concluded that the structural movement "was caused from a water leak caused by Kroger's neglect" when Kroger removed the freezer from the deli, and wrote in his memo,

> The damage that has been done to the front wall because of the movement of the Yazoo Clay should be the responsibility of Kroger because of their neglect and disregard for the building. They are being critical of us and want it repaired when I believe they are to blame.

Nevertheless, Chimneyville hired Lomax Anderson to caulk the cracks in the building in addition to patching the parking lot. The following day, March 28, Blake sent to Kroger a copy of Wardlaw's report, along with Heinz's observations as to the cause of the structural damage, and in his transmittal letter stated, "I will inform you of

---

**2.** Barry's efforts to sell and/or lease the proper-  ty are discussed *infra* at pp. 29–30.

the completion of the suggested repairs made by Lomax Anderson."

Kroger responded in a letter dated May 4, 1990, in which Rudemiller denied that the damage to the store and premises was Kroger's fault or due to Kroger's neglect or disregard of the building. He stated that there were no water lines running to or directly servicing the freezer area of the store and said—as it turned out erroneously—that the water systems at the property had been completely shut off. Rudemiller suggested that if water had indeed been running in the store, it was likely the result of "the actions of some of the many vandals who have plagued our attempts to keep this property in better shape, or may have been caused by one of the numerous people who have broken into this facility." In closing, Rudemiller expressed thanks for Chimneyville's having had some of the cracks in the building regrouted by Anderson, but stated that "this will likely be a temporary mitigation of a more serious situation, if the structural engineer's report is correct."

Beginning in February 1990, Jefferson–Pilot became aware of Kroger's complaints concerning the premises and began communicating with Chimneyville concerning Kroger's requests for repair and maintenance of the premises. A February 9 interoffice memorandum by Hansel Beeson, manager of Jefferson–Pilot's Mortgage Service Department, described the content of a telephone conversation with Varner:

> Kroger has continued to pay their rent. However, there is a feeling that they are preparing to attempt to break the lease. . . . I indicated he should do whatever is necessary to keep Kroger happy.

On February 14, 1990, after the telephone conversation on February 9, 1990 in which Ross Varner told Beeson that he was appalled to see the vandalism and overall condition of the property, Jefferson–Pilot sent a representative to the property to view its condition, as reflected by a Jefferson–Pilot interoffice memorandum from Grady Edwards to Beeson which includes pictures of the subject property. Varner wrote to Beeson on February 21:

> We both feel comfortable in that we have the Kroger lease for approximately another *Ten (10) years*, however, the center's physical condition continues to deteriorate due to lack of use, with cracks in outer walls, parking lot settling, and continued vandalism. Kroger has made several hints that they may attempt to legally try to get out of their lease. I don't believe they have a good case.

On February 22, Beeson wrote Varner:

> Since our conversation, we have had our representative inspect the property and frankly, we are concerned over its present condition. In this connection, I would like to again emphasize that you should do whatever is necessary to maintain the property so that the Korger [sic] lease will not be jeopardized.

A March 5 memorandum to the file by Beeson related another conversation with Varner in which Varner had indicated that

> Kroger is taking the position that they will attempt to break the lease if the security property is not maintained to their liking. Mr. Varner told me that he had informed Kroger that if they would itemize what they wanted done, within reason, he would see that the repairs were made. I told Varner on several occasions to do whatever was necessary to keep Kroger happy.

On May 10, Kroger served on Chimneyville "official notice" of its desire and intention to enter into a sublease with J.L. Holloway, who wanted to convert the building for use as office space. Rudemiller recited in his letter that prior to Holloway's taking possession, it would be necessary for Chimneyville to perform the "many outstanding repairs and improvements" which were its responsibility and of which it had been previously notified. Jefferson–Pilot, after being provided a copy of Rudemiller's May 10 letter, wrote Chimneyville on May 16, stating that as first mortgagee, it was "extremely concerned" about the condition of the premises and wanted to be kept fully informed of all actions taken. The letter specifically requested that Chimneyville furnish to Jefferson–Pilot a number of items, including a list of repairs to be made

and a timetable for starting and completing the repairs. Jefferson–Pilot's letter continued:

> Mr. Blake, as noted above, we are extremely concerned, and want to be sure that all is done to preserve the lease with Kroger. Please keep us posted on all activities and let us hear from you within a week.

Jefferson–Pilot again wrote Chimneyville on June 1, 1990 asking that it be kept posted on the progress in addressing the repair and maintenance work. The letter stated:

> Please refer to our letter of May 15, 1990 and advise as to when we can expect the information requested. As you can imagine with a loan barely ten years old, it is alarming to have the kind of trouble shown in the pictures. We are expecting you to do what is necessary to protect the lease with Kroger. Even if subleased, we want to be sure all landlord's obligations are fulfilled.

Chimneyville wrote to Jefferson–Pilot on June 12, acknowledging receipt of its correspondence, and stating:

> As you may be aware a sub-lease or sale of the property may be in the works. If this is a reality, the Landlord will have the fence removed, the trash cleaned up in the rear of the center and the parking lot patched to bring the property up to standard. It is our belief that until a tenant occupies the premises we will continue to experience vandalism on the premises. We intend to keep the property repaired, however, the maintenance will not be the same quality as if Kroger were operating a store.

On July 3, Jefferson–Pilot again wrote Chimneyville:

> Thank you for your letter of June 12. However, I believe you missed the point of my inquiry. My initial letter was in reference to Mr. Keith W. Rudemiller's letter of May 10, indicating there would be a sublease to J.L. Holloway. Mr. Rudemiller had requested that you move forward on the maintenance items prior to Mr. Holloway's possession. Please

keep us posted if the sublease goes through and when you do the repairs.

An unfortunate situation was discovered on July 2, however, which, as it turned out, operated ultimately to doom Kroger's chances of securing a sublease with Holloway. Stewart Barry, on a visit to the premises, found that the building had been substantially damaged by vandals who had pryed open an exit door on the southeast wall and stolen and/or seriously damaged the electrical, plumbing and HVAC systems. Rudemiller called Blake on July 2 with this information, and wrote to Blake on July 5, confirming their telephone conversation and asking that the matter be handled expeditiously by notification to Chimneyville's insurance carrier. Rudemiller emphasized that Kroger was continuing negotiations with and close to finalizing an agreement with Holloway such that Chimneyville's assistance in coordinating resolution of the matter was needed. Varner immediately reported this vandalism to Jefferson–Pilot and notified the insurance carrier.

Kroger's next and final communication with Chimneyville before filing suit was a July 10 letter, in which Rudemiller confirmed his May 10 letter expressing Kroger's intent to enter into a sublease with Holloway and advised that final sublease documents were in Holloway's possession and were expected to be executed shortly. Kroger demanded that certain repairs be made, as follows:

> Prior to his (Holloway's) taking possession of the premises, and coincident with his need to refurbish the building interior for use as office space, certain repairs that are the responsibility of the Landlord must be made. Further, because you have received several notices in the past regarding the majority of these repairs, and because Mr. Holloway will be on a fairly strict timetable, we must insist that the requested repairs be completed or substantially underway as specified herein:
>
> 1. Any damage which may exist to the building's foundation must be repaired. Mr. Holloway's requested date for

completion is July 31, 1990. Since the extent of the damage is presently undetermined, Holloway has dispatched his construction engineer to ascertain its extent. We shall forward any information we receive as soon as it comes to our attention, and we can discuss this item further at that point in time, particularly with regard to time needed for completion.

2. The temporary fence now surrounding this building is to be removed by August 30, 1990, if remodeling has begun, or as near thereafter as possible if the interior remodeling has been scheduled but not yet begun.

3. All debris and trash is to be removed from the exterior of the demised premises.... We must insist that you schedule regular sweeping and maintenance crews beginning immediately, and provide us, by August 30, 1990, with the names and the phone numbers of the companies who will be providing these services from this point forward.

4. The parking lot is in need of major repair. It may even need to be completely rebuilt, at least in certain places. At the very least it will require a complete levelling, a new blacktop overlay, as well as a total re-striping. This must be completed by September 30, 1990....

5. The electrical, plumbing, and HVAC systems removed and/or destroyed during the recent break-in must be restored to complete, good working order. I understand that insurance will cover some or all of the losses, so I hope you will see that this issue is resolved quickly. You may find it helpful to coordinate these repairs directly with Mr. Holloway's construction engineer or appropriate representative, since he may require less in his refurbishing than do Kroger specs, providing an opportunity for you to possibly lessen your needed expenditures.

Rudemiller went on to emphasize in the letter "the need for timely completion of the ... repairs.," and explained:

This sublease prospect has been the first entity willing to commit to a sublease on this facility since we began our search over three years ago. Should you fail to perform the obligations specified in our Lease Agreement and mentioned above, thereby hindering in any way our efforts to secure this sublease prospect, we will be forced to avail ourselves of all rights contained in our Lease. We look forward to receiving your complete and timely cooperation.

Jefferson–Pilot, which was served with a copy of Rudemiller's July 11, 1990 letter, responded on July 17 with the following to Chimneyville:

We recognize that when Kroger abandoned the property it is not reasonable to hold a landlord to the standard of maintenance which would be provided had the property been tenant occupied. This is so even though the tenant, Kroger, has been paying rent for several years, and a portion of this rent would be considered allocated to common area maintenance. On the other hand, Kroger arguably has been paying for maintenance and has a right to expect the property to be brought to a state of good repair in connection with its efforts to sublease the property. Kroger has placed you on notice that finalization of the sublease to Mr. Holloway is days away, and has demanded performance by you as landlord of the repairs specified in the July 11, 1990, letter.

As mortgagee of the real property and collateral assignee of the Kroger lease, with the lease being the primary security upon which the loan was granted, Jefferson–Pilot's paramount interest in this sublease transaction is maintaining in full force and effect an enforceable lease with Kroger. It certainly appears that a sublease of the premises to an acceptable tenant would be in the best interest of your firm as well as Jefferson–Pilot as mortgagee. This is to further advise that any action or inaction on your part which may constitute an event of default under the lease or which would otherwise give Kroger a reason to terminate the lease will constitute an event of default

under the Mortgage and the remedies specified therein or available by law.

Based on your recent inspection of the premises, it is imperative that the property be occupied by an acceptable tenant to avoid further deterioration and vandalism. I am confident you would not disagree with that. Should you have any disagreement with Kroger over the nature and extent of repairs required, we strongly urge you to settle those differences (or litigate them if necessary) outside the sublease transaction so as not to jeopardize the sublease or the main Kroger lease which is our security.

The differences were not settled and Kroger filed this suit on July 31, 1990.

## JEFFERSON–PILOT'S MOTION TO DISMISS

■ The assignment of leases to Jefferson–Pilot was collateral security for a note dated April 1, 1980 in the amount of $915,-000 from Chimneyville to Jefferson–Pilot which note was also secured by the deed of trust from Chimneyville. Kroger contends that Jefferson–Pilot is liable for damages for its failure to repair the premises, or alternatively that it should effectively be enjoined to immediately make necessary repairs and improvements since Jefferson–Pilot effectively assumed Chimneyville's obligations under its lease with Kroger. In support of its position, Kroger points out that under the assignment of leases to Jefferson–Pilot, if Chimneyville fails to keep, observe and perform any covenant of the lease, Jefferson–Pilot has the right to keep, observe and perform such covenant on Chimneyville's behalf. Further, pursuant to the terms and provisions of the lease agreements, Jefferson–Pilot is entitled to notice of default by Chimneyville under the

lease agreements and the opportunity to correct any such defaults, and upon such default is authorized to collect rents payable under the lease agreement and is authorized in the event of Chimneyville's default to take over and assume the management, operation and maintenance of the premises. Kroger asserts that based on these various lease and assignment provisions, as well as the fact that Jefferson–Pilot's collateral for the loan to Chimneyville was limited to the lease and to the property itself, Jefferson–Pilot did or should have taken steps to perform the repairs which Kroger demanded since it was aware that Chimneyville had not and was not responding to Kroger's demands. In other words, according to Kroger, Jefferson–Pilot had adequate notice of Chimneyville's default under the Kroger lease and thus was required to exercise the rights and the responsibilities granted it by the assignment of leases, and for having failed to do so is now jointly liable for Chimneyville's default under the lease. The court, however, concludes that the assignment of leases from Chimneyville to Jefferson–Pilot is merely an assignment as collateral security for the indebtedness of Chimneyville to Jefferson–Pilot and does not operate to impose on Jefferson–Pilot any of Chimneyville's obligations to Kroger under the lease agreements.

It is manifest that the assignment of leases was simply additional security for the loan from Jefferson–Pilot to Chimneyville. The assignment did grant Jefferson–Pilot the right to collect rents under the Kroger lease, but only in the event of a default by Chimneyville in payment of the indebtedness and only upon affirmative demand by Jefferson–Pilot to Kroger to make rent payments directly to Jefferson–Pilot.[3]

---

**3.** Paragraph 4 of the assignment of leases states:

And the party of the first part (Chimneyville) does hereby authorize and empower the said JEFFERSON STANDARD LIFE INSURANCE COMPANY to collect the rents payable under all of said leases above referred to as they shall become due, and does hereby direct each and all of the tenants of the aforesaid premises to pay such rents as may now be due or hereafter become due to the said JEFFERSON STANDARD LIFE INSURANCE COMPA-

NY upon demand of payment thereof by said Company. It is understood and agreed, however, that no such demand shall be made unless and until there has been a default in the payment of the indebtedness secured by the Deed of Trust or Mortgage herein mentioned, or default in the payment of any other sums secured by said Deed of Trust or Mortgage, or default in the performance of any of the covenants set forth in said Note or said Mortgage or Deed of Trust or Assignment of

Jefferson–Pilot has never declared Chimneyville in default and exercised its rights under the assignment to collect rents payable under the lease agreements, nor has it made demand on Chimneyville that it be allowed to take over the lease and its benefits. Furthermore, Jefferson–Pilot assumed no obligations for any repairs under the assignment, and indeed, the contrary appears inasmuch as the assignment provides: Nothing herein contained shall be construed as making the JEFFERSON STANDARD LIFE INSURANCE COMPANY a mortgagee in possession...."

It has been said that generally,

an assignment of a contract does not operate to cast upon the assignee the duties and obligations or the liabilities imposed by the contract on the assignor, in the absence of the assignee's assumption of such liabilities.

6 Am.Jur.2d *Assignments* § 109 (1963). Consequently,

an assignee of a contract ordinarily cannot be held liable to the other contracting party for a breach of the contract assigned. *This is particularly true where the assignment is merely for collateral security....*

6A C.J.S. *Assignments* § 95 (1975) (emphasis supplied); *see also Black v. Sullivan,* 48 Cal.App.3d 557, 122 Cal.Rptr. 119, 124 (1975) (assignment for security transfers rights but not obligations inherent in assigned contract).

In *In re Raleigh/Spring Forest Apartments Associates,* 118 B.R. 42 (Bankr. E.D.N.C.1990), the court considered the question of a secured creditor's entitlement to rents and adequate protection under a lease and rents assignment which provided that in the event of default, the lender had the right "at its option" to take possession of the property and collect the rents. 118 B.R. at 43. The court found that

Where the assignment is security for the underlying indebtedness and the agreement is that the mortgagor is entitled to have the rents until default, the assignment, however, is not absolute; it is con-

Leases, Rents and Profits; and until such demand is made, the party of the first part is

ditional. The mortgagee's right to the rents is not complete, even upon default, until the mortgagee takes some affirmative action to enforce the collection of rents.

*Id.* at 44. The same reasoning would apply to the lender's right under the lease assignment to assume control over the maintenance and operation of the premises.

Kroger appears first to contend in the case at bar that Jefferson–Pilot did in fact take some affirmative action to assume control over maintenance and repairs to the premises. It cites as examples of such action the fact that Jefferson–Pilot, upon becoming aware of Kroger's concerns about the premises, made periodic inspections of the premises and became actively involved in the claimed violations as evidenced by the various letters and memos to Chimneyville from Jefferson–Pilot in which Jefferson–Pilot insisted that Chimneyville make the repairs demanded by Kroger and keep Jefferson–Pilot posted on the status of Chimneyville's progress.

The proof does show that Jefferson–Pilot took a keen interest in all of the activity relating to the property. But it is clear that since the lease was the primary collateral for Jefferson–Pilot's loan to Chimneyville, Jefferson–Pilot was motivated by its concern over the possibility that Kroger might attempt to cancel the lease. Beeson testified that he did demand that Chimneyville make the repairs to the building which Kroger had requested, but did so because of a concern over the possibility that Kroger might attempt to get out of the lease which was Jefferson–Pilot's collateral, and not based on any legal determination by Jefferson–Pilot as to who was responsible under the lease documents for making the repairs. The matter was as simple as this: Chimneyville had an obligation to Jefferson–Pilot whereas Kroger did not. Jefferson–Pilot's purpose, therefore, was to prevail upon its debtor, Chimneyville, to make any repairs that were necessary under the lease agreement.

authorized to collect, or to continue collecting, said rents....

Kroger next suggests that even if Jefferson–Pilot took no affirmative steps to assume the management, operation and maintenance of the premises, it should have done so upon becoming aware that Chimneyville was not fulfilling its obligations under the lease. The court does not agree. In *Fitzgerald v. 667 Hotel Corp.*, 103 Misc.2d 80, 426 N.Y.S.2d 368 (Sup.Ct.1980), the court, construing the provisions of a lease assignment similar to that in the case sub judice, held that

> Until a default, a mortgagee has no opportunity, *much less an obligation*, to keep the premises in good repair. Moreover, the assignment at issue specifically limits the mortgagee's rights until there was a default by the owner.

*Id.* at 375 (emphasis added). Here, the parties have stipulated that no demand for payment of any rents due pursuant to the lease has been made by Jefferson–Pilot to Kroger under the terms of the assignment of leases, nor has notice of default in the payment of the indebtedness secured by the assignment of leases been made upon Chimneyville. And it is further stipulated that no demand has been made by Jefferson–Pilot on Chimneyville that it be allowed to take over the lease and its benefits. Jefferson–Pilot has never notified Kroger that the note secured by the assignment of leases was in default, nor has it notified Kroger to pay rents to Jefferson–Pilot due to any default by Chimneyville. The court concludes, therefore, that Kroger's complaint against Jefferson–Pilot should be dismissed.

## KROGER'S CLAIM FOR LEASE CANCELLATION

Kroger seeks cancellation of its lease with Chimneyville on the basis that Chimneyville failed to maintain and repair the premises as required by the lease. It contends that as a result of Chimneyville's breach, the premises was rendered uninhabitable, untenantable and unfit for the use for which it was leased, and further asserts that the deterioration of the premises caused by Chimneyville's omissions foiled its efforts to sublease the premises. The specific lease provision which Kroger contends Chimneyville breached is paragraph 11, which provides as follows:

> Landlord shall maintain the structure and the exterior of the premises, including, but without limitation, all paved areas, outside lighting fixtures, entrance and exit doors, windows in the outside wall, all structural portions of the building, subfloor, and all interior and exterior utility and service pipes and lines.... Landlord shall be responsible for all repairs, maintenance, and replacement of such equipment except that above assumed by Tenant. Any damage to Tenant's property occurring by reason of Landlord's failure to maintain and repair the demised premises after notice, except in emergency situations as set forth in this agreement shall be borne by the Landlord.

### Availability of Remedy

The parties herein first dispute whether the remedy of cancellation is available to Kroger. Chimneyville argues that there is no right of cancellation where, as here, the lease provides an alternative remedy, permitting the tenant, in the event of a breach by the landlord, to make repairs and deduct the cost of those repairs from future rental payments.[4] Based on the principle that forfeitures are disfavored under the law, it has been held that under Mississippi law "cancellation is appropriate only when monetary relief is wholly inadequate." *McLaurin v. Shell Western E. & P., Inc.*, 778 F.2d 235, 237 (5th Cir.1985). It has also been generally observed that the recovery of monetary damages by a lessee against the

**4.** Rudemiller testified that Kroger never seriously considered making the repairs and deducting the cost from future rental payments because of the magnitude of the required repairs and the expense that would have been involved. He took the position that Kroger was not required to avail itself of the self-help remedy contained in the lease because that remedy was obviously not meant to apply to the kind of major renovation or restoration which would have been required to bring the building back up to standard. The court would note that there can be no dispute but that had Kroger undertaken to make the repairs that were needed, Chimneyville would have been deprived of rental payments for a substantial length of time.

lessor for the lessor's failure to perform contractual maintenance and repairs to the leased premises is an adequate remedy. *See* 49 Am.Jur.2d *Landlord and Tenant,* § 842, at 809–10. In this case, however, it appears from the lease documents executed by the parties that Kroger was granted the right of cancellation. In addition to paragraph 11, paragraph 12 of the lease addresses Chimneyville's obligations to repair and Kroger's remedies in the event of Chimneyville's default:

> All construction, repairs, restorations, alterations, additions, or payments which are obligations of the Landlord, shall be completed within reasonable [sic] time after notice. [S]hould Landlord neglect or refuse to make or perform such construction, repairs, restorations, alterations, additions, or payments after notice, Tenant, without liability or forfeiture of its term or terms herein, may make or perform such construction, repairs, restorations, alterations, additions, or payments, and deduct the cost thereof from the rent thereafter payable.

An addition to paragraph 12 contained in an addendum to the lease states:

> Tenant agrees to give the holder of the first mortgage notice of any default, *wherein Tenant has the right to cancel this Lease,* provided Tenant is given proper written notice of the name and address of such mortgagee. However, any failure to give such notice shall not constitute a default by Tenant under the terms of this Lease, or a waiver of Landlord's default.

(emphasis supplied). The court concludes, based on the foregoing provisions, that the lease provided Kroger a right of cancellation upon the giving of the required notice.[5]

Notice of Cancellation

■ It has been said that leases which are construable as giving a right to forfeit or terminate require that notice be given of forfeiture or termination and that the failure to give such notice is a ground for granting equitable relief from an attempted forfeiture for that reason. 49 Am. Jur.2d *Landlord and Tenant* § 1087, at 1046–47 (1970). Having concluded that the lease provides Kroger the right of cancellation, the court must determine whether Kroger is entitled under the facts presented to avail itself of that remedy. Chimneyville argues, and the court, having considered all of the facts and circumstances surrounding Kroger's declaration of default and cancellation, agrees that Kroger failed to give reasonable and timely notice of Chimneyville's alleged breach and Kroger's intent to cancel the lease agreements prior to declaring a default and seeking a declaration of cancellation.

The record shows that Kroger informed Chimneyville by letter dated May 10, 1990 of its desire and intention to enter into a sublease with J.L. Holloway and advised in that letter that "prior to his taking possession of the premises, we will need to have your firm handle, repair and/or resolve the many outstanding maintenance items about which you have been previously notified." Kroger, though, went on to state, "We will correspond further on this matter in the near future." The next correspondence from Kroger was a letter dated July 5, 1990, whereby Chimneyville was informed by Kroger of the major vandalism which had been discovered on July 2. In that letter, Rudemiller wrote:

> Our subtenant may require less sophisticated plumbing and/or electrical systems than did Kroger, so we may be able to rebuild these systems at a lower cost than if they were rebuilt to Kroger specs, while at the same time tailoring the work to the needs of our subtenant.

---

**5.** As a basis for its claimed right of cancellation, Kroger relies on a provision of the lease which it interprets as an acknowledgment by the landlord that in the event of a breach of *any term of the lease,* "Tenant's remedies at law would be inadequate and therefore, in such event, Tenant shall be entitled to cancel this lease or to relief by injunction, or otherwise, at Tenant's option, and Tenant's remedies shall be cumulative rather than exclusive." Though the issue is not entirely free from doubt, it appears that this provision applies to a covenant contained within the same paragraph that the landlord would not lease another part of the shopping center to a retail food establishment.

However, neither Kroger nor Holloway communicated with Chimneyville any further concerning Holloway's plumbing or electrical needs. Rather, Kroger simply made another demand on Chimneyville to repair the damaged building. This demand was contained in the July 11, 1990 letter from Rudemiller to Chimneyville in which he identified the specific repairs which Kroger viewed as necessary in order for it to be able to sublet the premises to Holloway. This letter was Kroger's final communication with Chimneyville before filing suit on July 31, 1990.

Even in its demand letter of July 11, Kroger did not advise Chimneyville that it would consider the lease cancelled if the repairs were not completed. Indeed, Kroger never advised Chimneyville or Jefferson–Pilot that it would declare the lease forfeited or seek to cancel the lease if the repairs were not made. The closest Kroger ever came to notice of an intent to cancel the lease was in its July 11 letter in which it stated:

> Should you fail to perform the obligations specified in our Lease Agreement and mentioned above, thereby hindering in any way our efforts to secure this sublease prospect, we will be forced to avail ourselves of all rights contained in our Lease.

It is clear from the record, and in particular, the various items of correspondence between Jefferson–Pilot and Chimneyville and interoffice memoranda of Jefferson–Pilot describing conversations with Chimneyville representatives, that Chimneyville suspected prior to May 1990 that Kroger might attempt to "get out of" its lease. However, though Kroger perhaps hinted that it might take some action if the repairs were not performed as Kroger had requested, Kroger did not bring to Chimneyville's attention the urgency of the need for repairs until at the very earliest, May 10, and even then, Kroger said only that repairs should be performed before Holloway was to take possession; Kroger did not say when Holloway was to take possession. Stewart Barry testified that the first four items listed in Kroger's July 11 letter had been communicated to Chimneyville in ear-

lier negotiations with Holloway in May. However, not even Kroger knew of Holloway's timetable for completion of the repairs until June 31, when Holloway wrote to advise Kroger of those dates.

Moreover, even if Kroger's July 11 demand were to be construed as actual notice that Kroger intended to cancel the lease, it is manifest that Kroger did not give Chimneyville sufficient time in which to complete the listed repairs prior to filing this lawsuit. Hugh Holley, manager of Kroger's facility engineering department, testified that the repairs demanded in the July 11 letter would have taken at least two months to complete. And Barry opined that the repairs requested in the letter could not possibly have been completed before July 31, 1990. The letter itself confirms that repairs were not expected before July 31. Kroger demanded removal of the temporary fence by August 30, notification to Kroger by August 30 of the companies retained to perform cleaning services and completion of parking lot repairs by September 30. No deadline was established for the restoration of the electrical, plumbing and HVAC systems or repair of the structure itself. Indeed, though Kroger suggested in the letter that the structural repairs should be effected by July 31, Kroger advised Chimneyville at the same time that,

> Since the extent of the damage is presently undetermined, Holloway has dispatched his construction engineer to ascertain its extent. We shall forward any information we receive as soon as it comes to our attention, and we can discuss this item further at that point in time, particularly with regard to time needed for completion.

But it is undisputed that neither Kroger nor Holloway ever advised Chimneyville of Holloway's engineer's findings relating to the extent of the structural damage and the nature and extent of repairs to the foundation and Kroger never discussed the time which would be needed to complete the repairs dictated by the engineer's report. Perhaps that is because Kroger had not even received a copy of the engineer's

report before filing this lawsuit. Certainly the implication of Kroger's own letter was that Chimneyville should await receipt of the report before commencing such repairs.[6] Yet less than three weeks after demanding the repairs and threatening to take action if the repairs were not completed as demanded, Kroger filed suit seeking cancellation of the lease.

It has been held that the purpose of the lease provision requiring notice of default is to

> [draw] the landlord's attention to circumstances which the tenant believes to be in violation of the lease, warns the landlord that the tenant considers these circumstances to be of serious import, and *gives the landlord an opportunity to correct the alleged deficiency.*

*Chi–Mil Corp. v. W.T. Grant Co.,* 70 F.R.D. 352 (E.D.Wis.1976) (emphasis supplied), *modified,* 422 F.Supp. 46 (E.D.Wis. 1976); *Wolff v. Mauceli,* 237 Miss. 378, 114 So.2d 845 (1959) (notice of need of repairs necessary to put landlord in default of his obligation). In *Hurst v. English,* 357 So.2d 132, 134 (Miss.1978), the court observed that

> Where there is a covenant to keep the premises in repair or to make necessary repairs, the general rule, as stated in 49 Am.Jur.2d., *Landlord and Tenant,* section 838 (1970), is that unless it appears the landlord has knowledge of the need of repair, notice by the tenant to the landlord of such need is necessary to place the latter in default for not repairing the demised premises. This has been broadened by case law to include that *there must also be a reasonable opportunity to repair.*

357 So.2d at 134 (emphasis supplied).[7] Chimneyville was made aware of the need for certain repairs, such as to the structure of the building, and maintenance of the premises, but, considering the totality of the circumstances, was not given an opportunity to make the repairs which Kroger demanded. In this regard, the court would note that even if Chimneyville had been responsible to and had corrected the structural damage to Kroger's satisfaction, there would still have remained the matter of the substantial vandalism damage to the plumbing, electrical and HVAC systems of the building which was not even discovered until July 2 and could not have been repaired prior to July 31.

The court concludes that Kroger's failure to give reasonable and timely notice of Chimneyville's alleged default precludes cancellation of the lease agreement.

## KROGER'S CLAIM FOR DAMAGES

■ Kroger next suggests it is entitled to damages for Chimneyville's having impeded its efforts to sublease the premises to Holloway by failing to comply with its repair obligations under the lease. A review of the proof relating to the proposed Holloway sublease, however, leads the court to conclude that the reason for the failure of the lease to go through was not Chimneyville's omissions but rather the fortuity of the vandalism damage which occurred in early July 1990.

The record reveals that in early 1989 Kroger had entered into a listing agreement with Stribling Realty Company for the realtor to attempt to locate a tenant for the property. Stewart Barry worked for Stribling as a broker and became involved in March 1989 in trying to find a sublessee. Throughout the summer and fall of 1989, there was little activity of any import relating to the property. Though some people

---

**6.** Barry testified that he believed that he would have waited for Holloway's engineer's report before proceeding with major foundation repairs.

**7.** The court notes that the Mississippi Supreme Court in *Hurst* held that if the landlord under the lease has reserved the legal privilege of entry so that he may investigate for himself the condition of the premises, notice to the landlord by the tenant of the need for repairs is not a condition precedent to the landlord's duty. 357 So.2d at 134. Kroger argues that because the lease at issue in the case at bar does reserve unto Chimneyville a right of entry, notice of default was not required to be given. The court must reject this argument since the lease here also specifically sets forth a requirement in paragraphs 11 and 12 that the landlord be given notice of needed repairs.

expressed an interest in it,[8] no lessee was found. After the Stribling listing agreement expired, Barry continued in his efforts to find a subtenant on Kroger's behalf. When Chimneyville suggested in early 1990 that perhaps it would be best to sell the property, Rudemiller recommended Barry as someone knowledgeable about the property, and on February 7, 1990, Barry received a listing by Chimneyville to sell the property. Thereafter, Barry was introduced by another realtor to J.L. Holloway who was wanting to purchase or lease a facility that he could in turn lease to a state agency whose present lease was about to expire.[9] Holloway was interested in the Kroger building which he planned to remodel for use as office space by the state agency and in late April and early May, began negotiating to sublease the property from Kroger. At the same time, Holloway began making offers to Chimneyville to purchase the property. In May, offers and counteroffers were transmitted between Holloway and Chimneyville and it appeared at one point that they might reach agreement. However, as Stewart Barry put it, the hope for a contract "died on the vine," and Holloway began to concentrate his efforts on obtaining a sublease from Kroger.

Holloway explained that in early May, he felt that he had an agreement in principle with Kroger, as evidenced by a May 1 letter from Kroger setting forth terms and conditions which it found acceptable. Holloway used the letter to submit a bid to the state agency for the purpose of securing the agency as a sublessee. According to Holloway's testimony, the lease conditions imposed by the state provided that any lease awarded could be terminated if the construction, remodeling or renovation of the leased building contained in Holloway's bid proposal were not completed by July 31. He was, therefore, on a "strict timetable" for having the facility repaired and renovated based on his plans of re-leasing

the property to the state. Holloway wrote to Kroger on May 30, 1990 setting forth a list of items which he required to be completed prior to occupancy but he did not give Kroger a timetable for completing the work until a month later, on June 27, 1990, when he itemized the repairs and maintenance, as follows:

Repair building foundation
(July 30, 1990)

Remove plywood covering from glass and entry way
(August 30, 1990)

Remove all debris from the interior and exterior of the building
(September 30, 1990)

Repair, re-surface and re-stripe parking lot
(October 31, 1990)

On June 22, 1990, Kroger transmitted a draft of a sublease agreement to Barry for delivery to Holloway. Holloway made some additions, signed the document and returned it to Kroger.

After the vandalism event of early July 1989, Holloway was in a "time-bind," and felt "pressed." He faced the deadline for securing space and had to make a committment to his prospective sublessee or he would lose the opportunity for that sublease. It was therefore critical that some decisions be made concerning whether and how quickly the repairs would be made to the Kroger property. On July 12, Holloway's counsel transmitted to Kroger a final sublease agreement which Holloway had executed. Kroger, however, would not sign the sublease until repairs were made, or it received a guarantee from Chimneyville that the repairs would be timely made, since under the proposed sublease with Holloway, Kroger would have become fully responsible for making the repairs if Chimneyville did not do so, and according to

---

**8.** Barry had showed the property to a number of prospective tenants, including an individual who was considering using it for a bingo game, two church groups, and a car dealer. Other realtors with whom Barry had communicated concerning the property had also shown the building to prospective tenants.

**9.** According to Barry, he understood initially that Holloway was interested in purchasing the property. Later, it appeared that Holloway wanted to sublease from Kroger on favorable terms and ultimately buy on favorable terms.

estimates, the repairs were to cost in excess of $300,000.

It appears under the facts presented that ultimately, the July 2 vandalism of the interior of the building was indeed, as Barry put it, the factor that "killed the deal" with Holloway. The court cannot conclude that Chimneyville's failure to repair and restore the damaged building was the reason for the failure of a sublease between Kroger and Holloway. The evidence clearly showed that Holloway was on a strict timetable, and was in need of a lease by July 31, 1991. The evidence was uncontroverted that the severe vandalism that was discovered on July 2 could not have been repaired by that date. So, even had Chimneyville undertaken or completed structural repairs, the vandalism would still have operated to prevent a lease with Holloway from becoming a reality. Accordingly, Kroger's claim for damages for interference with its sublease with Holloway must be dismissed.

Finally, the court would observe that the proof belies Kroger's suggestion that Chimneyville was completely unresponsive to its demands. Specifically, the evidence showed that Chimneyville did take some action in response to Kroger's complaints about the vandalism and structural damage. It painted over graffiti on the face of the building on a number of occasions and re-grouted the cracks in the building after complaints by Kroger in November 1989 and again in February 1990. Rudemiller acknowledged in his testimony that after he wrote the November 22 letter to Chimneyville complaining of cracks, he had a conversation with Blake who said that Chimneyville would hire a structural engineer to view the property; in February 1990, Chimneyville dispatched Wardlaw to the property to determine the cause and extent of the structural damage. A copy of his report was transmitted to Kroger in April. Further, immediately upon learning of the vandalism damage in July 1990, Chimneyville reported the event to the insurance carrier for the premises. Moreover, a July 31 Jefferson–Pilot interoffice memo recites that Varner had called to say that:

Ray Blake claims everything in motion to move. Blake is meeting with Rudemiller week of August 6, says he is ready to clean up and repair as soon as sublease is signed. Kroger says they want to be sure landlord knows its obligations.

No! Sublease not signed. Varner is talking almost daily with Stewart Berry—the broker who is trying to get the deal together.

Rudemiller acknowledged in his testimony that Kroger had been told that Chimneyville planned to do the repairs, but stated that it could not sign the Holloway sublease until Kroger received guarantees from Chimneyville that the work would be performed by the deadlines established. But Chimneyville, he said, gave no guarantees.

## CHIMNEYVILLE'S COUNTERCLAIM

### Kroger's Right to Vacate

■ Chimneyville suggests that Kroger's vacating the store premises was in violation of an implied covenant of continuous operation under the lease agreements which has caused Chimneyville to suffer added financial burdens, specifically, increased insurance and maintenance costs, not bargained for or envisioned by the parties, for which Kroger should be required to pay. Chimneyville argues that a proper construction of the lease agreements and surrounding factual circumstances indicates the existence of an implied duty on the part of Kroger not to abandon or allow the leased building to stand vacant during the twenty-year primary term of the lease. It states that in considering whether a covenant of continuous operation is to be implied in any lease, the court must determine what the parties contemplated, intended and expected in entering into a long-term lease, and in support of its contention that one should be implied here, relies on *Columbia East Associates v. Bi–Lo, Inc.*, 299 S.C. 515, 386 S.E.2d 259 (App. 1989), in which a covenant of continuous operation by an anchor tenant was implied where the lease was silent on the issue of the tenant's right to vacate, and *Emro Marketing Co. v. Plemmons*, 855 F.2d 528

(8th Cir.1988), where the court concluded that the lease provisions supported finding an implied covenant of continuous operation. Here, however, in contrast to the cited cases, the lease supports a finding that there was no covenant of continuous operation since the lease by its terms contemplates that Kroger might not continuously occupy and operate the store, stating: [10]

> Notwithstanding any assignment or sublease, *or any vacating of the demised premises by Tenant,* Tenant shall remain fully liable on this Lease.

(emphasis supplied). Other terms of the lease also confirm that it was contemplated that Kroger might vacate the premises. For example, a covenant by Chimneyville not to lease any other part of the shopping center for the purpose of operating a food store or food department store would "cease to be in force and effect if Tenant ... does not conduct a business in the demised premises for the sale of groceries ... for a period of 180 days or longer." Under the terms of the lease agreements, therefore, Kroger had the option of vacating the premises, but would continue to remain fully liable on the lease.

Even were the lease documents somehow viewed as ambiguous, the parties' conduct from and after the time Kroger vacated the premises could certainly be considered to shed light on the construction which the parties placed on the lease provisions to ascertain their true intentions. *See Knight v. Sheppard Building Supply, Inc.,* 537 So.2d 1355 (Miss.1989); *Goldberg v. L.H. Realty Corp.,* 227 Miss. 345, 86 So.2d 326 (1956). In this regard, Kroger vacated the premises in 1986. Chimneyville accepted Kroger's monthly rental payments and never objected to Kroger's actions until Kroger filed its complaint over three years later. The only conclusion at which the court can arrive is that Kroger was within the rights granted it by the lease in vacating the store premises.

Waste—Vandalism

Chimneyville contends that by failing to protect and secure the property from vandalism, Kroger violated its obligation as tenant not to commit waste. Chimneyville asserts that Kroger under the lease and under the law had full possession and control of the building during the time the store was vacant, was aware of continuing vandalism and yet did nothing to secure the premises from the vandalism it was experiencing, and thereby permitted waste to be committed. The Mississippi Supreme Court has recognized that a tenant is liable to his landlord for waste either committed or permitted to be committed against leased property by strangers during the continuance of the lease. In *City Council of Greenville v. White,* 194 Miss. 145, 11 So.2d 816, 819 (1943), the court stated:

> The landlord's rights, after the tenant's entry, are confined to the protection of his reversionary interest merely—that is, to the maintenance of actions for such injuries as would, in the ordinary course of things, continue to affect such interest after the termination of the lease—whether the injury is committed by a tenant, an undertenant, or a stranger.

Numerous cases have recognized the tenant's duty to safeguard the leased premises from waste committed by vandals. In *Western Assets Corp. v. Goodyear Tire and Rubber Co.,* 759 F.2d 595 (7th Cir. 1985), the court affirmed an award of damages for permissive waste to the lessor against the lessee for damage to the leased premises caused by vandals after the lessee ceased operations and vacated the premises due to the unprofitability of its business. Similarly, in *Flores v. Rizik,* 683 S.W.2d 112 (Tex.App. 4 Dist.1984), the court upheld the lessor's claim against the lessee for vandalism damage suffered by the

---

**10.** Chimneyville takes the position that because Kroger was to be the anchor facility to attract smaller, satellite retail establishments within the shopping center for the future, it envisioned and relied upon the continuing operation of a grocery facility by Kroger or an assignee during the primary term of the lease. By the same token, however, Kroger could argue that it envisioned and relied upon the tenancy of such smaller, satellite retail establishments for its future profitability at that location.

leased building after the lessee had vacated. There the court stated:

> It is a basic proposition of the law of landlord and tenant that it is the duty of the tenant to exercise due care in the use of the leased premises and not to cause any material or permanent injury. This obligation is implied whether written into a lease contract or not. . . .
>
> Until notification effecting a termination of the tenancy, the building remains in the legal possession of the tenant and the responsibility for damages to the leasehold accompanies the legal possession.

683 S.W.2d at 116. The court in *Ault v. Dubois*, 739 P.2d 1117, 1122 (Utah App. 1987), likewise permitted recovery for vandalism damage occurring after the tenant had vacated but while the lease remained in effect:

> Dubois contends that he left the property in fine condition and has been made a scapegoat for vandals who descended upon the property and ruined it after he and his boys had left. Even if this were true, Dubois had legal possession of the property at the time of its ruination and therefore had a duty to safeguard it.

739 P.2d at 1122 (citing 49 Am.Jur.2d *Landlord and Tenant* § 922 (1979)). And in *Granger University Avenue Corp. v. First State Insurance Co.*, 99 A.D.2d 1022, 473 N.Y.S.2d 813, 815 (N.Y.App.Div.1984), the court observed:

> [A] tenant has a duty to exercise such ordinary care in its possession even against the acts of third parties.
>
> Thus, the failure to exercise such ordinary care to prevent acts of vandalism of third parties would constitute negligence and a tenant may be held liable for property damage resulting therefrom. A tenant is obligated to repair damage which is caused not by ordinary wear and tear, but by his wilful conduct or negligence and which amounts to waste.

While it is generally the case that a tenant will be liable for damages committed by vandals during the term of the lease, whether or not the tenant is actually occupying the leased premises, the lease in the case at bar contains an indemnity provision which appears on its face to render this general rule inapplicable to the vandalism damage sustained to the Kroger building. In particular, paragraph 19 provides in pertinent part:

> Tenant shall not be liable for any damages to the demised premises or any part thereof, caused by fire or other insurable hazards, *regardless of the cause thereof,* and Landlord does hereby expressly release Tenant of and from all liability for such damages. Landlord agrees to keep the demised premises insured for fire and extended coverage for the insurable value thereof in responsible insurance companies authorized to do fire and extended insurance business in the state where demised premises are located. Landlord and Tenant agree that all insurance policies, including plate glass insurance, shall include a clause waiving rights of subrogation against the other.

(emphasis supplied). It is undisputed that the vandalism damage to the building is an insurable hazard, and in fact, insurance claims have been made and paid for such damage. Chimneyville maintains, however, that an indemnity provision such as the one here involved should not be applied where the cause of the vandalism damage is the tenant's negligence in failing to protect the leased premises from such damage since to do so would effectively absolve the tenant of liability for its negligence.

Exculpatory clauses have been upheld in recent times based in large part on the theory that "freedom of contract is the dominant public policy, and since the contracts relate to the private business of the parties, they are not a matter of public concern." *Cappaert v. Junker*, 413 So.2d 378, 381 (Miss.1982). A review of the cases in Mississippi on the subject of the validity of exculpatory clauses which have the effect of exonerating a contracting party from his own negligence suggests that where the parties to the lease occupy equal bargaining positions, where the clause implicates only private, and not public interests, and where the exculpatory clause will not immunize a party from liability for damages caused by his violation of a duty

imposed by the common law, such clause will be enforced. In *Smith v. Smith*, 375 So.2d 1041 (Miss.1979), the Mississippi Supreme Court upheld the validity of an exculpatory clause in a commercial lease. The lessors there had agreed to "maintain and keep in a tenantable condition the roofing and foundation of the building," but in the same lease document, the lessee had agreed that "Lessors shall not be liable or responsible in any way for any damages to persons or property sustained in or about the demised premises during the term of this lease regardless of how same may be caused...." 375 So.2d at 1042. After the tenant took possession of the building, the roof began to leak but the lessors were unresponsive to her requests for repair. Her merchandise was damaged as a result of the leak and she was forced to move from the premises prior to the end of the contract term. The court described the exculpatory provision of the lease as merely an exercise of the lessors' right to contractually limit the extent of their damages. The clause was

> but a division of the risk involved, fully understandable and advisable when the landlord reserves no control over the type and value of the inventory of the tenant.

375 So.2d at 1042. The court also observed that the contract was unaffected by any public interest, and that there was no evidence of unequal bargaining power or of any overreaching by the lessors. *Id.* at 1043. In a later decision, the court, in *Cappaert v. Junker*, 413 So.2d 378 (Miss. 1982), addressed the question whether an exculpatory clause in a residential apartment lease should be declared void as against public policy. The lessee sued her lessor for damages sustained as a result of her fall on a common stairway which she alleged the lessors had failed to maintain. The lessee agreed under the terms of the lease to hold the lessor harmless for claims for damage to person or property caused by any act, omission or neglect of the lessor. The court found, however, that since a lessor is under a common law duty to maintain the common areas of the leasehold in a reasonably safe condition and is liable for damages for failure to perform this duty, the exculpatory clause, "insofar as it seeks to immunize (lessor) against damages caused by his negligence in maintaining the common area of the leased premises ... is void as against public policy." 413 So.2d at 382. The court in *Cappaert* distinguished *Smith* on the basis that:

> There was no common law duty on the part of the appellee (in *Smith*) to maintain the roof.... The present case is entirely different from *Smith* because, in the present case the lessor was under a duty to maintain the common area. In *Smith* the lessor was not under any common law duty to maintain the roof, so the exculpatory clause did not deal with any common law or statutory duty of the lessor.

413 So.2d at 382. In addition, the court emphasized that the notion of exculpatory clauses contained in residential apartment leases as purely personal affairs which do not affect the public interest ignored present-day realities, given the dramatic expansion in public use of rental units. *Compare Blain v. Sam Finley, Inc.*, 226 So.2d 742, 746 (Miss.1969) (indemnitee will be indemnified against his own negligence when contract shows by clear and unequivocal language that this is intention of contracting parties); *see also City of Jackson v. Filtrol Corp.*, 624 F.2d 1384 (5th Cir. 1980) (same).

The court concludes on the facts of the case at bar that the clause in question is not to be invalidated as against public policy. The court has recognized that Kroger was under a duty to protect the property against the acts of third persons which would, under *Cappaert*, seem to provide a basis for declaring void a lease provision which would relieve Kroger of liability for its failure to conform to this duty. However, the lease here, unlike the lease at issue in *Cappaert*, and much like the lease in *Smith*, invokes strictly private concerns and does not affect the public interest. There is not the obvious potential here that an injured party will go uncompensated for his damage, for the lease at bar provides for the mandatory purchase of insurance

as a method of risk allocation. Moreover, the lease specifically allocates responsibility between the contracting parties for injuries sustained by members of the public on the premises. And significantly, this is a commercial contract, negotiated by sophisticated businessmen, and is thus not marked by overreaching or unequal bargaining power. Enforcing the clause would not contravene public policy.

Chimneyville states that it is not its position that exculpatory clauses in contracts which immunize a party from the act of his own "simple and isolated negligence" are not enforceable in Mississippi, but rather, that under Mississippi law one may not exonerate himself from liability for intentional torts, willful or wanton misconduct or gross negligence. It claims that an exculpatory clause would not be extended to protect Kroger against the degree of its negligence which, according to Chimneyville, was gross negligence, bordering on intentional conduct, in failing to take steps to secure the property from vandalism after repeated incidents and unequivocal awareness of the problem which plagued the property. It is apparent from the proof, however, that Kroger took the position throughout the time that the property was being vandalized that the prevention and/or repair of such damage was the responsibility of the landlord and there was never a contrary suggestion by Chimneyville. For that reason alone, it cannot be held that Kroger was grossly negligent on intentionally permitted the vandalism to the building. Chimneyville's argument on this point is not well taken.

Chimneyville maintains alternatively that even clear contractual provisions which grant a party indemnification against his own acts of negligence will not be enforced where the indemnitor is not in a legal position to effectively prevent or otherwise control the hazards that caused the loss. *See Butler v. United States,* 726 F.2d 1057, 1065–66 (5th Cir.1984) (indemnitee may not enforce provision indemnifying against his negligence where indemnitor is prevented by indemnitee from properly relieving or warning of hazardous condition caused by indemnitee's negligence). The record does not demonstrate, though, that Kroger did anything to prevent Chimneyville from taking actions necessary to protect its rights. It is the case that Kroger remained in constructive possession of the property. However, in addition to the fact that Chimneyville was granted a right of entry by the lease, the record clearly shows that Kroger never undertook to prevent Chimneyville from doing whatever was necessary to protect the premises and even encouraged some action by Chimneyville. Indeed, Chimneyville actually did construct a fence around the perimeter of the building to prevent vandalism damage. Though that protective measure proved ineffective, there is nothing whatsoever tending to suggest that Chimneyville could not have taken further measures, such as the installation of an alarm system which the proof showed would have been relatively inexpensive and effective to prevent the substantial damage that has occurred at the hands of vandals.

Just as Chimneyville maintains that Kroger had the duty to protect the premises, the tenant in *Smith* argued that the landlord was responsible to repair the roof and the lease so provided. Nevertheless, the court observed:

> (Lessee) took no steps to remedy the defective condition of the roof, other than by protests to appellees, and suffered her property and inventory to be exposed to the water from the roof.... (Lessee) could have sought specific performance of (Lessors') contract. We also consider that there may have been other direct damages, such as diminution in rental value, but are of the view that the exculpatory clause of the contract was properly held a bar to appellant's recovery of the damages prayed.

375 So.2d at 1043. Based on the foregoing, the court must conclude that Chimneyville cannot prevail on its counterclaim against Kroger for recovery of monetary damages for the permanent damage caused to the building by vandalism.

Additional Burden to Chimneyville

██ In addition to seeking recovery for the damages which have been caused by

vandals, Chimneyville further seeks recovery for the additional expense burdens imposed by Kroger's cessation of operations in the building, as well as an adjudication that Kroger must in the future take steps to secure the property from vandalism. To the extent that Chimneyville has been required to expend additional maintenance costs as a result of Kroger's having vacated the premises, the court concludes that those increased costs must be borne by Chimneyville. While any such additional expenses may not have been specifically considered by Chimneyville upon entering the lease, the lease, as previously observed, contemplated that Kroger might vacate the premises. The same is true with respect to increased insurance costs incurred to date.

The proof at trial showed that the cost of insurance coverage for the premises has increased dramatically and the coverage provided decreased, and there is the danger of losing coverage altogether should there be any further damage to the building by vandals. The lease requires that Chimneyville furnish insurance coverage for the premises as does Chimneyville's contract with Jefferson–Pilot. Chimneyville would therefore be in violation of both the lease agreements and its obligations to Jefferson–Pilot to fail to maintain coverage on the premises. It is apparent that some action should be taken to provide greater protection for the premises, but under the circumstances, the court must conclude that Kroger is simply not required to take such action under the terms of the parties' agreement.

### Waste—Structural Damage

Chimneyville seeks damages for permanent waste to the building caused by structural damage which it contends Kroger negligently allowed to occur. In particular, Chimneyville contends that damage to the structure was directly caused by Kroger's allowing large volumes of water to flow into the vacant building from March 1989 through December 1989. In this regard, the evidence showed that when it vacated the premises, Kroger had the water service to the building discontinued. However, in late March 1988, workers went to the premises to remove equipment, and for the purpose of cleaning that equipment, Kroger had the water turned on. Apparently as an oversight, Kroger neglected to have the water turned back off. From March 1988 to March 1989, Kroger received bi-monthly billing statements from the City of Jackson Water Department which reflected water use through the meter of from zero cubic feet to 500 cubic feet. However, the statement for the several succeeding billing periods showed a dramatic increase in the water flow through the meter:

| | | |
|---|---|---|
| Sept. 25 to Nov. 17: | 12,660 | cubic feet, or 94,696 gallons |
| Aug. 1 to Sept. 25: | 17,550 | cubic feet, or 131,274 gallons |
| May 31 to Aug. 1: | 19,230 | cubic feet, or 143,840 gallons |
| March 27 to May 31: | 17,440 | cubic feet, or 130,451 gallons |

As shown by the final meter reading on January 23, 1990, 29,210 cubic feet of water were used between November 17, 1989 and January 11, 1990, which translates into 218,490 gallons. Kroger received and paid the water bills for each of these periods yet apparently failed to take notice of the fact that these statements were for a vacant building,[11] and did nothing to have the water turned off or to investigate the cause for the increased flow through the meter. Only after water was discovered on January 11, 1990 pouring out of the building, flowing across the parking lot and running down Robinson Road was the water meter shut off.

11. Holley testified that the water bills were paid on a routine basis along with the bills from all of the other Kroger stores. The amounts of the bills were not unusual for other stores within Holley's jurisdiction.

The first notification that the building was experiencing structural problems was Rudemiller's November 22, 1989 letter to Chimneyville which mentioned, for the first time, large cracks and separations in the front wall. The next notification came in February 1990, when Rudemiller wrote that the existing crack had widened significantly and a new crack had appeared. At trial, Charles Furlow, a geotechnical engineer, testified on behalf of Chimneyville that the building's foundation had heaved five to six inches in the northwest corner and in other areas as a result of water getting to the expansive Yazoo clays beneath the building. Furlow stated that the rapid expansion of the Yazoo clay beneath the structure could not have occurred in the absence of water penetration into the clays beneath the building during this time frame and opined that the sole cause of the sudden structural deterioration, which was first reported in November 1989, was the flow of more than 750,000 gallons into the vacant building from May 1989 through January 11, 1990. He observed in his report that "the cracking of the building occurred during the same period of time as the significant increase in water usage," and that some of the water "escaping from the distribution system apparently reached the underlying Yazoo clays thereby causing movement and cracking of the building." William Wardlaw also testified that in his opinion the cause of the structural damage to the building was the large influx of water that entered the building between March 1989 and January 1990.

It is uncontroverted that from March 1989 through January 17, 1990, over 700,000 gallons of water went through the meter of the vacant store. Not before January 11, 1990, however, had water been observed or reported inside or outside of the Kroger building. No one saw water standing in the building at any time prior to January 11, 1990. Stewart Barry, who was in the store on numerous occasions during the spring and fall of 1989, never saw water standing on the floors nor noticed any water leaks. Barry testified that in June and July 1989, he went into the building a number of times—at least three—

with a prospective tenant, Tony Hudgins. Beginning in June and going on into later in the year, he was in the building on five or six occasions with a church group which was interested in the property. He showed the building in August 1989 to at least two other persons, Bobby Scott and Bill Sturn. In November 1989, Barry showed the building with another broker. He testified that the other broker, to whom he gave keys to the building, went back into the building on more than one occasion, and indeed, went back with a contractor who was to give a cost of rehabilitating the store. Also in the last quarter of 1989, a second church group was interested in the building and went into and all through the building at least three separate times. But during all of this time and all of these visits to the building, Barry did not personally observe nor were there reported to him any water leaks or water on the floor or water coming out of the building.

Hugh Holley testified that the floor drainage system in the store was more than adequate to handle the volume of water reflected by the water bills, and that even had that volume of water actually flowed into the building—which Kroger does not concede—the water would have been disposed of through the drains. John Buford, who owns Buford Plumbing Company in Jackson, similarly testified that the drains should have handled the water shown on the bills. Chimneyville argues that contrary to Holley's testimony, the drainage system was obviously not adequate to handle the volume of water reflected by the water bills in light of the fact of the large amount of water which actually poured out of the building on January 11, 1990. However, in the court's view, the fact of water accumulating in and exiting the building in January does not undermine Holley's testimony. The record shows that during late December 1989 and early January 1990, pipes were frozen throughout the Jackson area as the result of the worst winter freeze in years, which caused pipes to burst in occupied and unoccupied buildings. Reports were made of frozen pipes thawing and leaking through

the first two or three weeks of January. According to Holley, during that winter, over a dozen Kroger stores, some in Jackson and some in Memphis, had frozen water pipes. Herbert Dodd, the independent adjuster retained by the insurance carrier, concluded after an investigation that two pipes had burst as a result of being frozen.[12] Further, the proof showed that from March 27, 1989 to November 17, 1989, around eight months, a total of approximately 500,261 gallons of water were introduced into the building (or an average of around 2000 gallons a day), whereas in the approximate two months from November 17, 1989 to January 11, 1990, 218,490 gallons, which averages out to about 4000 gallons a day, went through the meter of the building. Thus, it seems clear to the court that the greatly increased volume of water in January 1990 which caused water to accumulate inside the building and flow out into the parking lot and street is attributable to the freezing and consequent bursting of pipes in the building.

During his visit to the premises on February 22, 1990, William Wardlaw saw water standing on the floor in places and evidence of leaking. David Williams, a Kroger facility engineering technician, testified that in January 1990, he observed some water standing in a twenty square foot area in the center part of the sales floor. Stewart Barry stated that in March 1990, he saw a leak in the area of the deli and noticed that there was a minor amount of water around the deli area. And when Kerry Heinz had the water meter turned on to check for leaks, water was heard pouring into the building. But each of these observations was made after a time when water had apparently filled part or all of the building and flowed out onto the parking lot and street as the result of an extreme freeze causing burst water pipes.

In the court's opinion, despite the testimony of these experts, there remains a serious question as to whether the water that went through the meter actually entered the building and was somehow able to get to the Yazoo clays beneath the building. Both Wardlaw and Furlow appear to have reached conclusions as to the cause of the damage by a process of deduction, proceeding from the apparently undisputed premise that the structural damage was caused by the movement of Yazoo clay beneath the building which would not have resulted but for an infusion of water from some source. They have both reasoned that because Yazoo clay is present under this structure and because water activates Yazoo clays and because the water bills for the store reflect a large volume of water having passed through the meter, then somehow that water must have gotten to the clays beneath the building. But Wardlaw testified that to this day, he still does not know how water was getting to the Yazoo clay. In the report of his February 22, 1990 visit, Wardlaw, in identifying possible water sources, observed that gutters on the rear of the building had broken loose, a soffit panel above the main entry had fallen out of place and the exposed insulation showed evidence of having been wet, indicating leakage into the building of rainwater, and a cap flashing was loose on the southwest side wall which would allow rainwater to enter the building. In his testimony on cross examination, Wardlaw acknowledged that the condition with the soffit panel, the gutters which were broken away and the loose cap flashing could have allowed water to get to the Yazoo clay through cracks in the floor slab. Furlow also stated that he could not say where the water that went through the meter went. He could not say that the water did not go into the drains, other, of course, than the water which ran from the building on January 11 as a result of burst water pipes.[13]

12. The proof was to the effect that the pipes froze and burst despite the fact that Kroger employees winterized the store in the fall of 1989 by making sure the heating system in the building was functioning properly and setting the thermostat in the store above the freezing level.

13. Furlow stated that whether or not the floor drains had been initially effective would not alter his opinion as to the cause of the structural damage, but he failed to explain his basis for so stating.

The proof showed that Furlow had performed soil borings at different locations about the building and found water in only one of nine borings. Furlow admitted on cross examination that the water found in the one boring could have come from a number of sources. Further, in tests of the soil beneath the building, there were no areas of high moisture content.

Even could the court conclude on the evidence presented that the water that went through the meter was the cause of the structural damage to the building, the court would nevertheless conclude that Kroger's negligence was not the proximate cause of the damage. On a review of the entirety of the evidence presented, the court is left with the sense that the sole act of potential negligence on Kroger's part is its having received and paid the water bills for this vacant building. While that was certainly neglectful, in the court's opinion, it does not amount to negligence so as to render Kroger liable for the damage in question. Certainly some damage to the building would have been foreseeable as a consequence of water pouring into the building in the absence of a proper drainage system. However, the store was equipped with a drainage system designed to dispose of the volume of water shown on the bills.[14] And persons who were in and about the store during the time when the water is alleged to have flowed into the building never heard running water or saw any water on the floor of the store.[15]

The proof submitted by Chimneyville as to a method by which the water reached the subsoils is not preponderant, as it must be for Chimneyville to sustain its burden on its counterclaim for damage alleged to

have been caused by waste. Furlow explained in his testimony that anytime there is a continuous flow of water over a floor for an extended period of time, water can get beneath the slab in various ways, as, for example, by seepage through slight cracks in the floor. However, it can just as reasonably be concluded that from March through November 1989, the water which somehow escaped from the water distribution system did not accumulate or seep through the floor, but rather was disposed of via the store's drainage system and from there escaped into the subsoils. Or it could be the case that the water flowing through the meter was never actually deposited onto the floor of the store [16] and that instead, rainwater entered the building through the various means identified by Wardlaw.

In summary, the court is able to conclude on the evidence presented only that water went through the meter of the store. The court cannot conclude on the evidence adduced that the water which went through the meter entered the soils below the building or caused the structural damage to the building. While Kroger should have become aware of the water running through the meter by virtue of its receipt of the water bills, and reasonably should have undertaken to have the water service discontinued and investigated the cause of the water usage reflected by the bills, its failure to do so in view of the evidence presented does not amount to actionable negligence so as to entitle Chimneyville to recover for alleged waste committed by Kroger.

Future Repairs and Maintenance

The court would note in connection with the parties' future obligations that it

**14.** The court would note that the water had been shut off by the time Kroger received the bill for the water usage from November 17, 1989 through January 11, 1990.

**15.** Chimneyville suggests that Kroger was negligent in failing to inspect the interior of the building during the nine months of heavy water flow into the building. In this regard, the court would note that Stewart Barry, who was acting on Kroger's behalf to secure a tenant, actually was in the building and never saw any water which strongly suggests that even had Kroger inspected the building, it would likely have no-

ticed nothing out of the ordinary. Moreover, the court would simply note that Chimneyville had the right under the lease to enter the premises and inspect but did not do so at any time during this nine-month period.

**16.** Frank Morgan, with Kroger's facility engineering department, testified that when a toilet malfunctions, it will use three gallons of water a minute. Water was going through the meter at the Kroger store from March through at least November at a rate of about one and a half gallons a minute, so it is possible that the water went down the toilet.

agrees with the observation made by Jefferson–Pilot in its July 16 letter to Chimneyville:

> It is not reasonable to hold a landlord to the standard of maintenance which would be provided had the property been tenant occupied. This is so, even though the tenant, Kroger, has been paying rent for several years, and a portion of this rent would be considered allocated to common area maintenance. On the other hand, Kroger arguably has been paying for maintenance and has a right to expect the property to be brought to a state of good repair in connection with its efforts to sublease the property.

It is clear in the opinion of the court that repair of the structure of the building and the restoration of the plumbing, electrical and HVAC systems are necessary in order to render the building tenantable. The court concludes, based on the foregoing, that the duty to render the premises habitable devolves upon Chimneyville.[17]

CONCLUSION

Based on the foregoing, it is ordered that Kroger's complaint against Jefferson–Pilot be dismissed and further, that Kroger's complaint, insofar as it seeks an adjudication that the lease with Chimneyville is cancelled and insofar as it seeks damages for Chimneyville's alleged breach of the lease agreements be dismissed. Because Kroger's request for lease cancellation is denied, Chimneyville is entitled to and the clerk shall pay over to Chimneyville the rents paid by Kroger into the registry of the court. Kroger is entitled to have the premises brought into a state of good repair, including repair of the plumbing, electrical and HVAC systems and of the structure itself, and thereafter to have the premises reasonably maintained in accordance with the terms of the parties' lease. Finally, it is ordered that Chimneyville's counterclaim against Kroger be dismissed for the reasons set forth above.

The court would observe in conclusion that the fact that the court has denied Kroger's claim for lease cancellation obviously does not operate to preclude Kroger from hereafter seeking that remedy and indeed, from the date of the entry hereof, Chimneyville will hardly be in a position to argue that it is without notice of the need for repairs and restoration of the premises and that Kroger may seek a cancellation of the lease should Chimneyville fail to perform its obligations within a reasonable time or within such time as is permitted by the lease agreements.

A separate judgment shall be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

---

17. Regarding structural damage, both Furlow and Wardlaw stated that the subsurface clay, having been activated, will continue to move until it ultimately reaches a stabilizing balance and that consequently, there will likely continue to be shifting into the future unless properly corrected. Moreover, Wardlaw testified that continued movement will likely cause a support joist directly above one of the cracks in the front wall to fall. A dangerous condition, therefore, exists. Wardlaw recommended that in order to restore the structure, the entire building should be placed on a deep foundation. This, he said, would be the most likely method of affording future stability. Herbert Dodd, senior consultant at Unified Building Sciences, Inc., and the person hired by the insurance carrier to adjust Chimneyville's claims for damage to the property, testified that the cost of effecting Wardlaw's recommendation would be $1,025,425. Wardlaw offered an alternate solution of replacing the damaged wall and floor slab in the area where the expansive clay is actiive. This approach, the experts stated, would be far less costly initially, $325,237, according to Dodd, but less reliable to prevent future movement, and one which will likely involve future repairs. Kroger suggested at trial that the repairs which will be necessary to correct the structural damage are not as substantial as the experts contend. The court expresses no opinion as to the specific repairs required.