# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 94-CA-00427-SCT

*MIDSOUTH RAIL CORPORATION*

*v.*

*CITIZENS BANK & TRUST COMPANY, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/04/94 |
| TRIAL JUDGE: | HON. ROGER C. CLAPP |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | EARNEST G. TAYLOR, JR. |
| | MICHAEL T. DAWKINS |
| ATTORNEY FOR APPELLEE: | ROBERT S. MURPHREE |
| NATURE OF THE CASE: | CIVIL - PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED ON DIRECT APPEAL; REVERSED AND RENDERED ON CROSS-APPEAL - 7/24/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/14/97 |

**BEFORE SULLIVAN, P.J., PITTMAN AND BANKS, JJ.**

**PITTMAN, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. On June 13, 1989, Citizens Bank & Trust Company, Inc. ("Citizens Bank") filed a declaratory judgment action in the Chancery Court of Rankin County, Mississippi, against MidSouth Rail Corporation ("MidSouth"). The suit was filed to determine the liability of Citizens Bank to MidSouth for environmental clean-up costs incurred by MidSouth.

¶2. MidSouth removed the case to the United States District Court for the Southern District of Mississippi, basing its cause of action against Citizens Bank on the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). After Citizens Bank filed a motion to remand the case to the Chancery Court of Rankin County, to which the Federal Court complied because of lack of a federal claim, MidSouth responded with an answer and counterclaim asserting that Citizens Bank was liable to MidSouth for all of the clean-up costs and attorneys' fees,

pursuant to the express terms of the lease assigned to Citizens Bank by the bankrupt sulphur processor, or, alternatively, that Citizens Bank was liable for a contribution of at least 50 percent of the costs under Mississippi environmental and contribution statutes.

¶3. The Rankin County Chancery Court dismissed MidSouth's lease assignment claims finding that the assignment was a collateral assignment not a general assignment, and therefore, Citizens Bank was not liable under the terms of the lease. The trial court also found that the bank was not the owner of the site or an operator of the business and, therefore, it was not liable for clean-up costs under Miss. Code Ann. § 49-17-43(d).

¶4. The trial court did rule for MidSouth under Count 3 of its counterclaim finding that Citizens Bank was responsible for creating the necessity for a clean-up as provided by Miss. Code Ann. § 17-17-29(4) and, therefore, was responsible for paying its pro rata share of the clean-up costs. However, the trial court found that $107,893.45 of MidSouth's claim, having been incurred before the effective date of the contribution statute, Miss. Code Ann. § 85-5-7, was barred and assigned only ten percent of the remaining guilt to Citizens Bank. The effect was to find Citizens Bank liable for $6,027.92 of the $161,000 claim.

¶5. After the lower court dismissed two of MidSouth's three counterclaim issues and allowed for a recovery of only $6,027.92, MidSouth filed an appeal to this Court. Citizens Bank has cross-appealed, asking this Court to rule that Miss. Code Ann. § 17-17-29(4) does not create the cause of action that the lower court indicated.

## STATEMENT OF THE ISSUES

¶6. MidSouth raises four issues on appeal, but this Court will discuss only one, as the other issues were properly treated by the trial court and have no bearing on the decision.

### I. DID THE TRIAL COURT ERR BY FINDING THAT CITIZENS BANK, AS THE LESSEE'S ASSIGNEE, WAS NOT LIABLE FOR THE BREACH OF ENVIRONMENTAL COVENANTS IN THE LEASE?

## STATEMENT OF THE FACTS

¶7. On November 30, 1987, MidSouth executed a five-month lease for two acres of land bordering its railway line in Rankin County to Gulf Coast Sulphur Production, Inc. ("GCSP"), a Florida corporation. MidSouth was aware that GCSP sought to process raw sulphur on the site. The lease required GCSP to abide by all environmental laws and to reimburse MidSouth if the railroad had to pay for environmental remediation of the site. MidSouth, in addition to receiving a nominal rental fee of $150 monthly, expected to make money shipping the processed sulphur to GCSP's customers.

¶8. After obtaining the lease with MidSouth, GCSP shipped more than 5,000 tons of sulphur to the site for processing. It also set up processing equipment which would heat the sulphur, convert it to a liquid and remove dirt and other impurities. Then, it would ship the clean marketable sulphur to customers in Tennessee and other locations by rail.

¶9. Soon after dumping the raw sulphur at the site, GCSP mismanaged its capital and began experiencing financial difficulty while building the processing plant, prior to the beginning of

operations. In early 1988, GCSP approached John McCaskill, a local businessman who had been constructing buildings on the site for GCSP. GCSP asked McCaskill about investing in the business. McCaskill conferred with Ralph Lord, his financial advisor, about investing in GCSP. Lord was a stockbroker at Kidder Peabody and a director of Citizens Bank. Lord researched the sulphur processing market and advised McCaskill concerning investment possibilities with GCSP.

¶10. At this point GCSP was still struggling financially, and McCaskill loaned $50,000 to the business. Due to a great deal of indebtedness, GCSP still needed cash. McCaskill approached Citizens Bank about making a loan to the company for $50,000. The loan was based on McCaskill's financial background, a net worth of more than $2,000,000, and his loan history, but the loan was in the name of GCSP. It was agreed that GCSP would repay the loan to McCaskill when it received a larger loan after securing its inventory at incorporation. Prior to making the loan to McCaskill for the use of GCSP, Citizens Bank asked for no assurances that the company was in environmental compliance, even though the raw sulphur was already at the site. McCaskill then secured three separate loans for approximately $50,000 each on March 11, March 22, and April 19, 1988. On each of these loans, McCaskill signed the note as GCSP's secretary/treasurer.

¶11. During this period, the Bank's loan officer, Bart Cannon, assembled the necessary lien documentation. Citizens Bank secured its position with the personal guaranty of John McCaskill, the guaranties of the other individuals in the company, and a lien on the equipment at the site. The Bank had an appraisal on the plant equipment showing a value of $734,904.93. GCSP assigned its lease to Citizens Bank and the bank requested and obtained a Landlord's Waiver from MidSouth. The Bank sought to protect its interest in the equipment in case of default. Guaranteed access to the site appeared to be the best way to secure the interest. Loan officer Bart Cannon made the decision to create a collateral assignment, and he sent a letter to MidSouth asking for this assignment on March 23, 1988. MidSouth signed and returned the assignment on April 15, 1988.

¶12. By this time, McCaskill was directing the operation of the GCSP plant. McCaskill was concerned about the validity of the corporation, as it was not registered with the Mississippi Secretary of State. McCaskill proposed, and the other owners of GCSP agreed, that a new corporation be formed to take over the assets and liabilities of GCSP. McCaskill also negotiated to receive voting stock from the new corporation for himself as well as Ralph Lord.

¶13. The new corporation, Gulf Coast Sulphur Corporation ("GCS"), was formed in early April 1988, and the Articles of Incorporation were filed with the Secretary of State on April 11, 1988. The new corporation assumed both the assets and liabilities of GCSP. GCSP also assigned the remaining sixteen days of its lease of the plant site property with MidSouth to GCS on April 14, 1988.

¶14. GCS requested a $200,000 loan from Citizens Bank to refinance the $150,000 of indebtedness assumed by GCS from GCSP as well as cover an overdraft balance in its checking account. Citizens Bank did consider the possibility of the loan being an "insider" loan because of the involvement of Lord. McCaskill testified that Lord's stock was transferred to McCaskill without payment as part of an agreement to protect McCaskill's interests in the new corporation.

¶15. When the lease came up for renewal, MidSouth wrote to GCSP asking about a renewal, and GCSP indicated that it wanted the lease renewed. On May 2, 1988, Lee Hopper, president of GCS executed a rider extending the lease until April 30, 1989. The Bank prepared a new collateral

assignment for Gulf Coast Sulphur, similar to the one the Bank had prepared for GCSP, and forwarded it to MidSouth on May 10, 1988. However, MidSouth never executed the new Assignment of Lease, nor was any new lease issued to GCS, specifically, after the first lease expired on April 30, 1988. The trial court held that the failure by MidSouth to execute a new assignment eliminated any liability of Citizens Bank for obligations under the lease.

¶16. GCS continued to lose money. In August of 1988, GCS filed a petition for bankruptcy in the United States Bankruptcy Court for the Southern District of Mississippi. GCS abandoned the processing site, leaving behind close to 5,000 tons of sulphur on the ground with no environmental protection in place to prevent drainage runoff or a fire. There is evidence that both MidSouth and Citizens Bank knew that leaving the sulphur on the ground could be a potential environmental hazard.

¶17. On April 25, 1989, the sulphur caught fire. The emergency branch of the Mississippi Department of Environmental Quality ("DEQ") responded to the fire, as did seven area fire departments. MidSouth employees were also on the scene. After the fire was extinguished, the DEQ requested that MidSouth, Citizens Bank and other interested parties attend a status conference at the DEQ. Bob Rogers, the DEQ's emergency coordinator at the site, explained what had happened and discussed the continuing danger that the open sulphur piles posed for creating acidic water runoff and fires.

¶18. The DEQ billed MidSouth, the landowner, for more than $7,000 in emergency costs incurred in putting out the fire and removing contamination from the site. MidSouth made efforts to find another processor to take over the site, but these efforts failed. The DEQ required MidSouth to remediate the abandoned sulphur piles and ordered MidSouth to remove the sulphur from the site. MidSouth effectively complied with the order from the DEQ and incurred more than $160,000 in expenses.

¶19. Since the clean-up, MidSouth has amassed attorneys' fees in an attempt to obtain reimbursement from Citizens Bank. This reimbursement is the central issue in the case at hand. MidSouth asserts that Citizens should be liable for at least half of the incurred costs based on Miss. Code Ann. § 85-5-7. MidSouth asserts that the cause of action is created by Citizens's violation of both Miss. Code Ann. §§ 49-17-43(d) and 17-17-29(4). In the alternative, MidSouth states that, as an assignee, Citizens Bank is liable for any breach of the covenants of the lease made with GCSP. If true, Citizens would be liable for the entire amount of remediation and clean-up costs.

## ANALYSIS

### I. DID THE TRIAL COURT ERR BY FINDING THAT CITIZENS BANK, AS THE LESSEE'S ASSIGNEE, WAS NOT LIABLE FOR THE BREACH OF ENVIRONMENTAL COVENANTS IN THE LEASE?

¶20. The trial court dismissed Counts 1 and 2 of MidSouth's counterclaim at trial. Count 1 suggested that Citizens was liable for the clean-up costs because they took on the obligations of GCSP/GCS under the lease through a general assignment. Count 2 claimed that even if the assignment between Citizens and GCSP/GCS was collateral, rather than general, that the assignee was still responsible for performance of lease covenants that run with the land. The trial court found that there was no valid assignment in effect at the time of the fire.

¶21. The relevant sections of the assignment between Citizens Banks and GCSP are as follows:

I. Assignment: In consideration of sums loaned or to be loaned, Borrower assigns, transfers and conveys to Lender, subject to the terms of this Assignment, all Borrower's rights, title, and interest, including any extensions or renewals thereof, of Borrower's lease of certain real property owned by MidSouth Rail Corporation (Lessor) . . .

II. Representations and consents: . . .

. . .

D. In the event of default, . . . Lender shall have and may exercise all the rights and remedies afforded under the Uniform Commercial Code and all other applicable statutes to realize upon its security.

. . . any default . . . and Lender shall have the option of demanding immediate payment of the Note . . . or in the alternative performing such obligation or curing such breach or default . . .

III. Assignment as security: This Assignment is made solely as to security for the repayment of the Note or notes made at the execution hereof or any renewals or extensions thereof, and shall remain in full force and effect as long as such indebtedness remains unpaid. Upon repayment in full of such indebtedness, Lender shall convey all rights hereunder back to Borrower.

¶22. There are two questions before the Court on this issue. First, does the assignment, whether general or collateral, place liability on Citizens Bank, as assignee, through the obligations required of GCSP/GCS under the lease from MidSouth? Second, did the failure of MidSouth to expressly accept the new assignment following the creation of GCS eliminate any or all obligations of Citizens Bank under the lease?

¶23. As to the first question, both parties cite voluminous amounts of reference material regarding lease covenants, assignments of contracts, and landlord/tenant law, in an attempt to solidify a position regarding liability under the lease covenants. To clarify this vast cloud of legal rhetoric, a few rules should be set forth. First, under Mississippi law, an assignee of a contract does not incur the obligations of the assignor barring express agreement. *Coggins v. Joseph,* 504 So. 2d 211, 213 (Miss. 1987); *see also,* 32 Am.Jur. § 370 *Landlord & Tenant* (1960). Both parties appear to be in agreement on that issue. The parties do not agree as to the effect of the assignment itself. The general rule is that, in cases of general assignments involving leases, the assignee takes on the obligations of the assignor when the lease covenants involved "run with the land," regardless of express agreement. *Coggins v. Joseph,* 504 So. 2d at 214. Based on this Court decision, it can be inferred that if the assignment is considered a general assignment, the burden of GCSP/GCS's lease obligations is transferred from GCSP/GCS to the assignee, Citizens Bank, if the covenants "run with the land." Provisions of the lease which affect the use, condition and value of the land are said to "run with the land." 49 Am.Jur.2d § 452 *Landlord & Tenant*(1970). MidSouth goes to great lengths, citing case after case, explaining what the Court has held as covenants "running with the land." MidSouth makes a valid argument that the environmental covenants in the lease "run with the land," because they enhance the value of the land, are incident to the surface estate, directly affect the land, and enhance the reversionary interest of MidSouth.

¶24. However, is the argument advanced by MidSouth applicable to the case at hand? All of the law cited by MidSouth involves a general assignment where the assignee assumes all the rights and obligations of the assignor. Citizens Bank claims that the lease at hand was collateral, serving only to secure its interest in the equipment on site and that it did not assume the rights or the obligations of the assignor.

¶25. MidSouth asserts that the language of the lease makes Citizens Bank a general assignee with all the rights and obligations of an assignee. They cite the following excerpt for the assignment between GCSP and Citizens Bank:

> I. Assignment: In consideration of sums loaned or to be loaned, Borrower assigns, transfers and conveys to Lender, subject to the terms of this Assignment, **all Borrower's rights, title, and interest,** including any extensions or renewals thereof, of Borrower's lease of certain real property owned by MidSouth Rail Corporation (Lessor).
>
> . . . .

(Emphasis added).

¶26. According to MidSouth, this language gives Citizens Bank all the rights and obligations of a general assignee, and therefore Citizens should be bound by the lease terms and covenants. Citizens Bank points to another section of the assignment:

> III. Assignment as security: This Assignment is made **solely as to security** for the repayment of the Note or notes made at the execution hereof or any renewals or extensions thereof, and shall remain in full force and effect as long as such indebtedness remains unpaid. Upon repayment in full of such indebtedness, Lender shall convey all rights hereunder back to Borrower.

(Emphasis added.)

¶27. Citizens asserts that this language clearly indicates the purpose and intent of the parties with regard to the assignment.

¶28. Because of perceived ambiguity in the assignment, the trial court considered testimony regarding the intent of the parties. All parties involved, even those associated with MidSouth, testified that the assignment was made by Citizens Bank to assure itself of a right to enter the property and reclaim the equipment should there be a default on the loan. Citizens Bank and GCSP acted in accordance with the assignment being merely collateral. Citizens never took over the processing of sulphur. Rather, GCSP retained possession and continued to run the business as it pleased. Citizens also argues that the actions of MidSouth prove that there was never a doubt as to the intentions of the parties. MidSouth's corporate representative, W.O. Kelly, testified that MidSouth never sent lease bills to Citizens, sent the lease extension agreement to GCSP rather than Citizens, and never anticipated Citizens taking over the lease site and the sulphur processing facility.

¶29. The assignment itself seems to travel two distinctly separate paths. First, it grants full rights to the assignee, and then it states that it is only for security purposes. Citizens claims that MidSouth signed the assignment and, therefore, knew the intention of the parties. They also claim that there can be no complete assignment where the assignor is still required to perform. Finally, Citizens argues

that it had an option rather than a duty to cure any breach. After reviewing the testimony of the parties, the actions of the parties, and the assignment itself, the trial court found that there was no assumption of obligations under the lease. However, the trial court wrote in its opinion that no lease existed, for reasons to be discussed shortly. One thing does appear to be clear. From the testimony and actions of the parties, it is obvious that the intent of the assignment was to secure Citizen's interest in the property of GCSP. The intent of the parties determines whether the assignment is an absolute assignment or only intended as a collateral security assignment. 6A CJS *Assignments* Section 82.

¶30. MidSouth insists that the ambiguity of the assignment is irrelevant and urges this Court to require collateral assignees to assume the obligations of their assignors for covenants that run with the land, without the need for express agreement.

¶31. This Court rejects MidSouth's assertion for two reasons. First, it has been held that a mortgagee assumes no lease obligations from an assignment that is for collateral security. ***Kroger Co. v. Chimneyville Prop. Ltd.,*** 784 F.Supp. 331, 340 (S.D. Miss. 1991). Kroger leased property from Sunflower Development Corp. Jefferson Standard Life Insurance Company (presently Jefferson-Pilot) ("JP") issued a loan to finance the property development secured by a deed of trust and further secured by an assignment. Kroger's business was unprofitable, and it left the premises. Kroger sought a new tenant but could not find one because of the condition of the property. Kroger sued Chimneyville and JP claiming that the lease was violated because the property was untenantable, uninhabitable, and unfit for the purpose for which it was leased. The Court held that JP's assignment was simply additional security for the loan. *Id.* at 339. Although JP had the right to collect rent, that provision was only invoked upon default, and JP had the option of proceeding with that course of action. *Id.* The Court held that this assignment was conditional, and where the assignee's rights were conditional, so were its obligations. *Id.* at 340.

¶32. *Kroger* is comparable to the case *sub judice*. In both cases, a wronged party seeks to recover from a deep-pocket who has done nothing to create direct liability. Much like the environmental compliance covenant in the present case, the covenant in *Kroger* did affect the physical use or enjoyment of the property. As MidSouth argued earlier, these types of covenants have been held to run with the land. In *Kroger*, the Court did not look to the type of covenants. The Court did not ask if the covenants run with the land. Instead, the Court decided the case purely on the fact that the assignment was collateral. *Id.*

¶33. Although the cases do have similarities, there is one distinguishable difference. The assignment provisions in *Kroger*, although not presented in the case, do not appear to have any character of a general assignment. The lease in the case *sub judice* does have characteristics of a general assignment, and this could be distinguishable from *Kroger*. The language used in the assignment attempting to protect the interests of Citizens Bank is over broad and could be read to convey the obligations of a general assignment. However, the actions of the parties involved clearly indicates that the intent of the agreement was to create a collateral assignment for security purposes only, despite the broadness of the language used.

¶34. The second reason for rejecting MidSouth's breach of contract assertion is public policy. In today's society, banks must secure their loans to insure payment. An assignment agreement allowing

a bank to enter property to repossess secured items should not create liability arising from the action or inaction of the assignor. As pointed out by Citizens Bank and the Mississippi Bankers Association (MBA), a decision to hold Citizens Bank liable would have significant consequences. For example, many banks today buy loans from other banks across the country. Often, this is done by assignment. There could potentially be a series of assignments between banks. Following that line of thought, a lessor such as MidSouth could charge a bank with liability under the terms of the lease, when the bank's representatives have had no contact with the land or assignor in question, the bank and the land in question are in different states or countries, and the only involvement by the bank was to buy a group of loans from another lender. There is no culpability, no control of the enterprise in violation, and possibly no contact. This situation differs from an active assignment where a person takes possession, active control, and all the benefits of the assignment. A general assignee has a much closer nexus to the action which causes the breach.

¶35. The trial court ruled that there was no valid, executed assignment at the date of the fire. The trial court held that MidSouth's failure to sign the new assignment applying to the lease extension following the creation of GCS acted to void the agreement. This Court gives deference to the finder of fact. *Madden v. Rhodes*, 626 So. 2d 608, 616 (Miss. 1993).

¶36. MidSouth makes a strong argument as to this point. MidSouth argues that the assignment is enforceable because MidSouth waived its rights to object by its actions. In other words, MidSouth would be estopped from objecting to the assignment after its actions appeared to accept it. Acquiescence by a lessor to a provision specifically barred in the lease operates to estop the lessor from making a claim based on that provision if he is aware of the violation and takes no action. *Adams v. Graham Stave & Heading Co.,* 160 Miss. 266, 135 So. 198 (1931). In *Robertson v. Fuller,* 212 Miss. 888, 56 So.2d 74 (1952), a lessee assigned its lease to another party and the lessor was aware of the situation and accepted rents. When the lessor attempted to declare the lease forfeited, the court held that the breach had been waived. *Id.* at 76.

¶37. On the other hand, both of the cases, *supra*, involve lessors who accepted rents from the assignee. Citizens never paid any rent, as it was not in possession of the property. The record is unclear as to the actions of the parties between the creation of GCS and the fire.

¶38. In conclusion, MidSouth argues that the Court must decide whether an assignee assumes all liabilities arising from covenants that run with the land. This Court will not extend the general rule of assignments (assignee assumes obligations of covenants that run with the land) to collateral assignees. It appears clear from the record that Citizens Bank is not a general assignee based on the testimony and the actions of the parties involved. The trial court was correct in considering evidence to clarify the contradictions included in the assignment itself. As to a collateral assignee, the obligations of the lease are not enforceable. *Kroger,* at 204. Forcing the obligations of the lease onto a collateral assignee also violates public policy. The trial court concluded that there was not a valid assignment in effect at the time of the fire, and we give deference to the trial court's decision. Regardless of the status of the assignment, the collateral assignee should not be burdened with the obligations of the assignor.

## CROSS-APPEAL

¶39. Citizens Bank asserts five points of error on cross-appeal. We find only one to be of merit.

## IV. DID THE LOWER COURT ERR IN FINDING A LENDER HAS RESPONSIBILITY OR LIABILITY UNDER MISS. CODE ANN. § 17-17-29(4)?

¶40. Citizens argues that the trial court was in error both legally and factually by using Miss. Code Ann. § 17-17-29(4) to attach liability to Citizens Bank. The trial court found that Citizens Bank was liable under the statute as "any person creating, or responsible for creating, . . . an immediate necessity for remedial or clean-up action." Miss. Code Ann. § 17-17-29(4). Citizens argues that this is manifest error.

¶41. The relevant portions of the statute are as follows:

(4) Any person creating, or responsible for creating, through misadventure, happenstance, or otherwise, an immediate necessity for remedial or clean-up action involving solid waste shall be liable for the cost of such remedial or clean-up action and the commission may recover the cost of the same by a civil action brought in the circuit court of the county in which venue may lie. This penalty may be recovered in lieu of or in addition to the penalties provided in subsection (1), (2) and/or (3) of this section.

Miss. Code Ann. § 17-17-29(4)

¶42. The trial court properly noted that the statute is penal in nature requiring that the statute be narrowly construed. It is a general rule of statutory construction that penal statutes are to be strictly construed. ***Mississippi Insurance Commission v. Savery,*** 204 So. 2d 278 (Miss. 1964).

¶43. Citizens Bank argues that the lower court ignored this rule in its interpretation of the statute, by deciding that the Bank would be liable for clean-up costs. Since Citizens Bank loaned money to the business creating the environmental problems and the loan enabled the business to operate, the trial court found Citizens Bank to be "responsible for creating . . . an immediate necessity for remedial or clean-up action." Citizens Bank argues that the trial court's interpretation is an erroneous interpretation of the law and urges this Court to reverse the chancellor after reviewing the question of law de novo. A question of law is reviewed *de novo* by the Court, and the Court may reverse for an erroneous interpretation. ***Matter of the Estate of Mason,*** 616 So. 2d 322 (Miss. 1993); ***Bank of Mississippi v. Hollingsworth,*** 609 So. 2d 422 (Miss. 1992).

¶44. Citizens Bank asserts that a lender is not the type of person that the statute intended to be liable for "creating or responsible for creating, through misadventure, happenstance, or otherwise" the necessity for a clean-up by the commission. This broad application of the statute by the trial court could have serious ramifications. As stated by the Bank, if a lender can be considered under this statute, so can any other person or company whose actions make the business possible. Citizens Banks suggests that the truck drivers who brought in the raw sulphur, the company who leased GCSP the boiler, the power company who supplied electricity, and MidSouth would all be liable under the trial court's interpretation of the statute. "But for" the actions of all of the above-named parties, the sulphur processing business would not be able to function. All of these businesses "enabled" GCSP/GCS to operate, using the language of the trial court. Although some of the

examples above are rather distant, they still show the broadness of the interpretation of the trial court.

¶45. The trial court felt that Citizens Bank "clearly enabled the operator of the facility to continue its business, and being motivated largely by its need for the operator to succeed so as to pay back earlier indebtedness, and being charged with knowledge of the hazardous nature of the enterprise, should incur liability under MCA § 17-17-29(4)." The trial court held that as a matter of public policy:

> No one should be permitted to encourage or enable an enterprise (by infusion of capital or otherwise) which eventually results in immediate necessity for remedial or clean-up action involving solid waste and nevertheless be absolved of any responsibility, if the enabler knew or should have known of the hazardous nature (potential for solid waste problems) of the enterprise, and particularly if, as in this case, the enterprise would not have proceeded without such enabling action.

¶46. The trial court found this to be a matter of public policy without necessity for case precedent. MidSouth agrees. They argue that the trial court's ruling holds lenders accountable for environmentally irresponsible projects.

¶47. Citizens Bank suggests its own public policy, which was also considered by the trial court. Citizens Bank and the MBA assert that extending the scope of the statute would negatively impact lenders and their customers across the state. By placing liability on lenders for "enabling" business operations, banks would be subject to liability for environmental contamination to which they did not cause or contribute. The liability would arise not when the bank takes title to foreclosed property and takes possession, but rather the liability would arise when the financial transaction was closed. This liability would serve to discourage business development and to apply the consequences of one party's act to a more financially sound party with no fault. An innocent lender could become subject to liability in virtually any type of loan. The MBA uses many examples to prove its point that the scope of liability is too broad. Assuming the arguments of the MBA and Citizens Bank are valid, the only reasonable conclusions are an increase in the cost of loan transactions, a decrease in business capital due to stricter loan guidelines, and a corresponding decrease in business development.

¶48. In conclusion, the trial court's broad interpretation of Miss. Code Ann. § 17-17-29(4), holding Citizens Bank liable for "creating" an environmental hazard, violates the requirement that statutes be construed narrowly. *Mississippi Insurance Comm'n v. Savery,* 204 So. 2d 278 (Miss. 1964). By assigning liability to Citizens Bank, the trial court has opened the door, allowing a plethora of lawsuits to be brought against innocent lenders. As explained by the MBA, public policy prevents this Court from accepting the ruling of the trial court. The alleged public policy cited by the chancellor is subordinated to a contrasting public policy and vastly outweighed by the economic ramifications presented by the MBA. Therefore, it is the holding of this Court that Miss. Code Ann. § 17-17-29(4) does not impose liability on lenders as "any person creating, or responsible for creating, . . . an immediate necessity for remedial or clean-up action."

¶49. **AFFIRMED ON DIRECT APPEAL; REVERSED AND RENDERED ON CROSS-APPEAL.**

**SULLIVAN, P.J., BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. LEE, C.J.,**

**CONCURS IN RESULT ONLY. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION. PRATHER, P.J., NOT PARTICIPATING.**


**McRAE, JUSTICE, DISSENTING:**


¶50. In this case, Citizens Bank, as assignee, should be held responsible to perform all covenants included in the lease. The language within the lease makes Citizens Bank a general assignee with all the rights and obligations of any assignee. Further, under Mississippi's environmental responsibility statutes, Citizens is liable for the cost of cleanup of the site in question. Because the majority interprets the lease and our statutes differently, I dissent.

¶51. When it received the lease, Citizens Bank "stepped into the shoes" of Gulf Coast Sulphur Production, thus becoming a potentially responsible party. As an assignee, the bank became responsible for assuming liabilities arising from the environmental covenants that "run with the land." The covenants in the lease under review enhance the value of the land, are incident to the surface estate, directly affect the land, and enhance MidSouth's reversionary interest. Therefore, Citizens Bank is obligated to assume liability from these covenants.

¶52. Additionally, the loans from Citizens Bank allowed the operator of the site to continue business. It follows that Citizens Bank acquired an interest in seeing the site succeed so that the bank would receive its money back. In this case, Citizens Bank was clearly aware of the hazardous nature of the site's business, and it encouraged the enterprise to continue, even when financial ruin drew near. Under Miss. Code Ann. § 17-17-29(4), then, the bank must incur liability.

¶53. It is for these reasons that I dissent.