**TOC RETAIL, INC.**

v.

**GULF COAST OIL CO., et al.**

No. 94–1949.

United States District Court, E.D. Louisiana.

May 1, 1995.

Regina Carol Scotto Wedig, Alvin Joseph Bordelon, Jr., Bordelon, Hamlin & Theriot, Donald E. Theriot, New Orleans, LA, for TOC Retail Inc., American Gaming Corp., Tenneco Oil Co., AMGAM Associates.

Nathan T. Gisclair, Jr., Brian Thomas Leftwich, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, for Vincent Paciera, Lena Lee Romaguera Trust, Vincent Paciera, Jr., Kirth M. Paciera, Lena P. Romaguera.

Nathan T. Gisclair, Jr., Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, for Lena (Lee) P. Romaguera Trust.

## ORDER AND REASONS

JONES, District Judge.

Pending before the Court are cross-motions for partial summary judgment on liability filed by the parties. Having reviewed the memoranda of the parties, the applicable law and the record, the Court GRANTS the motion for partial summary judgment of defendants/counterclaimants and DENIES the motion for partial summary judgment of plaintiff.

## Background

### A. General Facts

Gulf Coast Oil Company of Mississippi, Inc. (hereinafter "Gulf Coast"), whose stock was owned by the Paciera family, had been in business for many years prior to 1959 owning, leasing, and operating retail gasoline service stations and station sites in Louisiana, Mississippi, and Alabama.[1] On January 1, 1959, Gulf Coast leased the property at issue to Tenneco Oil Company, then known as Tennessee Gas Transmission Company. The property was located on the Gulf of Mexico side of U.S. Highway 90 in Biloxi, Mississippi.[2] At the time of the lease the property had been operating as a retail service station and had buildings and other improvements on it, including tanks, pumps, canopies, islands, driveways, signs and lighting.

In January 1971 Gulf Coast and Tenneco entered into another lease agreement, whose terms are the subject of the instant lawsuit.[3] The 1971 lease was on a printed form used and prepared by Tenneco, other than a one-page, typed addenda and a typed addition to Article IX of the lease.[4] Tenneco operated the subject property as a retail service station until approximately 1986, when the existing buildings and improvements were demolished to make way for a new building and improvements to serve as a retail service station and convenience store.

Tenneco operated the station site until August 1988, when it assigned the 1971 lease to plaintiff, TOC Retail, Inc. (hereinafter "TOCR"), a wholly owned subsidiary of Tenneco whose principal business was the operation of retail gasoline outlets and truck stops.[5] In September 1989 TOCR exercised its option to renew the 1971 lease for a 15-year period through December 31, 2004.[6] At this time, the operations at the site had been and were expected to be profitable.

Meanwhile, in 1988, Gulf Coast was liquidated, with ownership of the property at issue passing to its stockholders, the Paciera family.

In July 1992 the stock of TOCR was acquired by E–Z Serve Corp., and TOCR remains a separate corporate entity wholly-owned by E–Z Serve.

One year later in July 1993 TOCR entered into a commercial sub-lease with American Gaming Corp.[7] At that time American Gaming was in the process of developing and bringing to commercial fruition the Gold Coast Casino gambling boat. Notwithstanding the sub-lease, TOCR continued to operate the site as a service station until April 1994, when TOCR, at American Gaming's request, caused the building and all improvements on the property to be demolished. TOCR also removed its equipment and trade fixtures from the property. TOCR did not notify the Paciera family of its intention to demolish and remove the building and improvements prior to that time; nor did the Paciera family give approve or consent to the demolition and/or removal of the buildings and improvements at any time prior to April 1994.

Subsequent to the demolition and removal of the buildings and improvements, the property was paved, curbed, striped, and—pursuant to the TOCR/American Gaming sub-lease—used as a parking lot for the Gold Coast Casino gambling boat.

---

1. Except as otherwise noted, this background is taken from the "Joint Stipulations of Fact for Summary Judgment Motions" filed by the parties (R.Doc. 23), except for one amendment made by the parties. *See* footnote 6, *infra*. Attached to the joint stipulation are leases and other documents the parties deem relevant to this matter.

2. Exh. A., R.Doc. 23.

3. Exh. B., R.Doc. 23.

4. The 1971 lease was amended on November 9, 1983, extending the lease term and option periods and increasing rental payments. Exh. C,

R.Doc. 23. However, the parties agree in their fact stipulation that the amendment "is not otherwise germane to the dispute which is the subject of these proceedings." R.Doc. 23, Paragraph 8.

5. Exh. F, R.Doc. 23.

6. "Joint Motion to Amend Stipulations of Fact," R.Doc. 29.

7. Exh. H., R.Doc. 23.

In response to an inquiry from Vincent Paciera, one of the defendants/counterclaimants, "E–Z Serve Management Company" [8] sent a letter dated May 3, 1994, to Vincent Paciera stating that TOCR disagreed with his views but appreciated his comments.[9] The letter also stated: "Please be assured that we will scrupulously adhere to the lease requirements which govern our occupancy of the property."

On May 11, 1994, Vincent Paciera, an attorney, responded in another letter.[10] He quoted Paragraph VIA of the January 1971 lease and, on that basis, stated that TOCR had violated the lease through the demolition of the "structure" on the property and its intended use as a parking lot "with no improvements."

TOCR wrote back, saying that the prior two letters from Paciera had been confusing and stating that the parking lot was an "improvement" under the definition of that term in Black's Law Dictionary.[11] The letter further warned: "[P]lease be advised that we must view any interference with our leasehold rights as a breach of our right of peaceful possession, and tortious interference with the lease contract. While we hope that such is unnecessary, we will forcefully pursue any rights for damages in such a circumstance."

### B. Procedural History

Shortly after this exchange of correspondence, TOCR filed suit in this Court, seeking declaratory relief to the effect that the intended use of the property as a parking area constitutes the conduct of a lawful business under the lease and does not constitute a breach or defaults under the lease by TOCR.[12]

TOCR named as defendants Vincent Paciera, individually and d/b/a Gulf Coast Properties, and the Lena Lee Romaguera Trust, which allegedly owned all right, title and interest in the property at issue.

Vincent Paciera, Vincent Paciera Jr., Kirth M. Paciera, Lena P. Romaguera and the Leena (Lee) P. Romaguera Trust No. 3 appeared as "defendants herein and/or current owners and lessors of the subject property" and filed an answer and a counterclaim.[13] The Pacieras counterclaimed not only against TOCR for breach of the lease but also against Tenneco because, although Tenneco had the right to assign the lease or sublet the property, such an assignment or sublease did not relieve Tenneco of its obligations under the lease per the lease itself. Further, the Pacieras filed a counterclaim against American Gaming and AmGam Associates, to which American Gaming had allegedly assigned the sublease from TOCR because they had an interest in the lawsuit. The Pacieras sought damages for breach of the lease as well as recognition that the lease was terminated and/or cancelled due to the actions of TOCR and Tenneco. The Pacieras sought to have the sublease and its assignment set aside also. Finally, the Pacieras sought to have a constructive trust imposed on TOCR for any payments it may have received as a result of its failure to act as a prudent administrator/fiduciary with respect to the property.

### C. Lease Provisions

The parties have stipulated that the 1971 lease agreement and its amendments "do not specify that failure to operate a retail gasoline service station by the lessee constitutes a breach of the Lease." [14]

However, certain provisions of the lease are determinative of the outcome of the present motions, especially because the parties have also stipulated that, other than the lease

---

8. The record is not clear whether this entity is a division of E–Z Serve Corp. or TOCR. The parties' joint stipulation of facts indicates that TOCR sent this letter. (Paragraph 29, R.Doc. 23.) Nevertheless, the Court finds that the author of the letter is irrelevant to the matter at hand.

9. Exh. K., R.Doc. 23. The Court was not provided with a copy of Vincent Paciera's letter to TOCR, to which the response was aimed.

10. Exh. L., R.Doc. 23.

11. Exh. M, R.Doc. 23.

12. R.Doc. 1.

13. R.Doc. 2. For literary ease, these parties will be referred to hereinafter generally as the "Pacieras."

14. Paragraph 38, R.Doc. 23.

itself, "no party has any evidence or testimony to adduce concerning the intent of Tenneco or Gulf Coast in entering the 1971 lease." [15]

Article III of the lease states: "Said premises are leased for the purpose of the sale and storage thereon of gasoline, petroleum and petroleum products, as well as a general merchandising business, *and at Lessee's option for the conduct of any other lawful business thereon.*" (Emphasis added.) [16]

Article VI states:

It is understand and agreed that Lessee may at Lessee's option construct or cause to be constructed certain buildings, driveways, sidewalks, and other improvements as it deems necessary, and that said buildings, driveways, sidewalks, and other improvements shall remain the property of Lessee during the term of this Lease. At the final termination of this lease, said buildings, driveways, sidewalks and other improvements, except Lessee's equipment and trade fixtures, shall become part of the realty and title thereto shall pass to Lessor.

Article VI has an addendum, which states: "Lessee shall have the right, but not the obligation, to demolish any and all existing structures now or hereafter situated on the premises for the purpose of constructing more modern improvements at Lessee's sole expense."

Article IX of the lease provides that "[l]essee shall have the right and privilege to assign this Lease or sublet said premises, in whole or in part, for the whole or any part of the term of this lease, or any extension thereof, upon such terms as to it shall seem best, *but shall not be relieved of its obligations thereunder.*" This emphasized phrase was a typed addition to the printed form.

Finally, for present purposes, Article XIII states, in pertinent part: "It is agreed that Lessee may make such additions, alterations, replacements and improvements upon the buildings and equipment on said premises as it shall seem best for the conduct of its business, or for the use of said premises for any purpose authorized hereunder."

### Law and Application

The parties agree that Mississippi law applies in this case. The application of the law of our sister state entails a venture into common law rather than the usual short trip into Louisiana Civil Law more often applied in diversity cases in this court. This foray is made easier and more comfortable, however, by the luxury of a wealth of cases dealing with the interpretation of lease agreements not only from Mississippi but also from other states applying common law principles.

The Court begins this travel with a brief review of general principles regarding lease interpretation and then moves directly to the law relevant to the precise issue in this case: whether, in light of the words of the lease agreement, TOCR can sublease the property for use as a parking lot and not for use as a retail service station/convenience store.

The Mississippi Supreme Court has stated:

(I)n the construction of a written lease, the intention of the parties must be ascertained from the language of the written instrument itself, where that is not ambiguous. Where the language of a deed or lease is unambiguous, the "object is to ascertain the intention of the grantor as expressed by the language used, and not the unexpressed purpose which may at the time have existed in his mind, the question being not what the parties meant to say, but the meaning of what they did say, the actual intention contrary to the legal effect of the deed being immaterial, even though apparent from the instrument itself."

*Sharpsburg Farms, Inc. v. Williams,* 363 So.2d 1350, 1354 (Miss.1978), quoting *Stuart v. McCoy,* 163 Miss. 551, 141 So. 899 (1932) (editing in original). *See also Farragut v. Massey,* 612 So.2d 325, 328 (Miss.1992) ("Where the language of a lease is unambiguous, it must be enforced according to its plain meaning.")

---

**15.** Paragraph 31, R.Doc. 23.

**16.** As noted above, the 1971 lease is attached to the parties' joint stipulations of fact as Exh. B.

As noted, the parties have stipulated that there is no oral testimony to supplement the 1971 lease at issue. Even if the Court were to find that the lease is ambiguous, there is no evidence to supplement the lease language. However, "mere disagreement" over the terms of a lease do not make it ambiguous. *Simmons v. Bank of Mississippi*, 593 So.2d 40, 43 (Miss.1992).

Further, the clauses of a lease must be read "in the manner that best fits the words of the lease in its entirety, open to the implicit, as we absorb the explicit." *Id.* "We seek as well that meaning most coherent in principle with the best justification which may be found for [lease language], given the underlying substantive facts." *Id.* (Citations omitted.)

As to the specific issue before this Court, the Mississippi Supreme Court has twice addressed similar problems. In *Delta Wild Life & Forestry, Inc. v. Bear Kelso Plantation, Inc.*, 281 So.2d 683 (Miss.1973), the Mississippi Supreme Court affirmed a lower court ruling dismissing a complaint brought to remove "clouds [of title]" on more than a thousand acres of land. *Id.* at 683. Plaintiff had leased this land to G.L. Johnson, and the lease provided that defendant could "put any part or all of said land in pasture, and to erect such fences or other improvements thereon as Lessee may need in and about such operations, and may remove at Lessees (sic) option such fences or improvements at the termination hereof." *Id.* at 683–84 (editing in original). Shortly thereafter, the lessees converted the pasture land into "cultivated row crops lands for the purpose of growing soybeans." *Id.* at 684.

Later, plaintiff agreed to allow a sublease and/or assignment of the lease under certain conditions. *Id.* at 684–85. The lessee exercised his option to renew the 1962 lease, but he died about one year later. His brother, who was his business partner, and his widow, who was the lessee's sole heir, "quitclaimed" the 1962 lease to defendant, which continued the agricultural operation. *Id.* at 685. Plaintiff then forwarded defendant "a notice

to quit on the 1962 lease," but defendant refused and remained in possession of the property. *Id.* The main issue addressed by the Mississippi Supreme Court was whether the "pasturage clause" quoted above was sufficient for plaintiff to succeed in its effort to oust defendant from the property. *Id.* The Court found that not only was the "pasturage clause" inconsistent with the formal resolution by plaintiff to allow the sublease [17] but also that it was "evident from the acts of the parties themselves covering many years that they contemplated that these lands ... would be converted to crop use." *Id.* at 686.

> We have concluded that the 'pasturage clause' ... is to be regarded as permissive and not restrictive. As a general rule it may be said that a tenant is entitled to use leased premises for any lawful or valid purpose, without interference on the part of the landlord, so long as such use is not forbidden by any express provision of the lease or by some necessarily implied construction of the instrument. This Court [has] said:
>
> > Restrictions intended to limit the use of property to a particular purpose should not be left to implication, but should be clearly defined and understood by all the parties.

*Id.* at 686–87 (citations omitted).

Years after *Bear Kelso,* the Mississippi Supreme Court addressed a similar issue in *Ewing v. Adams,* 573 So.2d 1364 (Miss.1990), coming to the same conclusion as in *Bear Kelso* but adding a caveat. The Supreme Court addressed restrictions in a lease that property be used as a drive-in movie theater and found that "while not restricting the use of the property to that particular purpose, neither does it mean that the lessee has a completely unrestricted right of business use of the property." *Id.* at 1365. In its decision, the Supreme Court quoted the foregoing language from *Bear Kelso* and discussed cases from other jurisdictions explaining the permissive nature of restrictions and the requirement that any restrictions must be

---

17. Plaintiff expected that the premises would "be kept in a good state of cultivation and properly farmed by the sublessee." *Id.* at 685.

clearly defined and not left to implication. *Ewing,* 573 So.2d at 1367–68.[18]

However, the Supreme Court found that these general principles of law do not translate to *carte blanche* use by a lessee of the lessor's property.

> [A]re the words "to be used for a drive-in movie theater" no restriction whatever on the lessees' use of the property? No. 51C C.J.S. *Landlord and Tenant* § 337, ... after setting forth the general law above noted, states further:
>
>> In other words, a covenant that premises shall be used for a specified purpose does not impliedly forbid their use *for a similar purpose which is not injurious to the landlord.*
>
> Also, 49 Am.Jur.2d [*Landlord & Tenant*] § 240, ... states that words descriptive of the use of the premises cannot be construed as restricting the lessee "to the *distinctive* use which the words may suggest. They will not be construed, at the instance of the lessor, as proscribing the use of the premises for *something similar or related* to the designated purpose."
>
> *Ewing,* 573 So.2d at 1369 (emphasis in original).

The Mississippi Supreme Court then agreed with the following pronouncement of the Ohio Supreme Court in *Bevy's Dry Cleaners and Shirt Laundry, Inc. v. Streble,* 2 Ohio St.2d 250, 208 N.E.2d 528 (1965):

> [U]ses similar or related to the general scope of the described use will not be prohibited as between the lessor and the lessee. We cannot speculate on a solution to the problem presented if, for example, [lessee] elects to operate on its premises a foundry, slaughterhouse or some other instrumentality inconsistent with the type of construction, the character of the building or the adjacent properties.
>
> *Ewing,* 573 So.2d at 1369–70.

As a result, the Supreme Court reversed the final judgment in favor of the lessee, finding that the lessee had only sought a declaratory judgment for unrestricted, lawful use of the land while the lessor only sought declaratory judgment restricting the use of the land to a drive-in movie theater, "now obsolete businesses in this state." *Id.* at 1370. "As we have noted, neither extreme position is correct. The answer lies somewhere between." *Id.*

With these principles in mind, the Court turns to the lease at issue. First, the lease does not contain any provision specifically restricting the use of the property to a retail service station/convenience store. Article III specifically states that the property may be used at "Lessee's option for the conduct of any other lawful business thereon." While Article VI provides that any buildings, driveways, sidewalks, etc., shall become part of the "realty and title thereto shall pass to Lessor" at the termination of the lease, Article VIA provides that lessee can demolish any existing structures and construct "more modern improvements" on the property. Further, Article XIII provides that lessee can make "additions, alterations, replacements and improvements upon the buildings and equipment on the premises as it shall seem best for the conduct of its business, or for use of said premises for any purpose authorized hereunder."

■ At first glance it appears that Article XIII conflicts with Article VIA in that improvements must be made upon the buildings and equipment on the premises. However, the second clause of Article XIII provides more generally that "improvements" can be made upon the buildings for use of the premises "for any purpose authorized hereunder," which, as shown by Article III, is for conducting "any other lawful business thereon." Moreover, as the Mississippi Supreme Court has stated, absent an explicit restriction on the use of the property or a "necessarily implied construction of the instrument," a tenant is entitled to use the property leased "for any lawful or valid purpose." *Bear Kelso,* 281 So.2d at 686–87. Such an explicit construction or necessarily implied construction does not exist here.

TOCR argues, as it did in one of its letters to Vincent Paciera, that the parking lot is an

---

**18.** These cases include two relied on by plaintiff: *Forman v. United States,* 767 F.2d 875 (Fed.Cir. 1985) and *Rapids Associates v. Shopko Stores, Inc.,* 96 Wis.2d 516, 292 N.W.2d 668 (1980).

"improvement" in accord with the definition of that word in Black's Law Dictionary. Under the Mississippi law cited above, that contention is too simplistic to resolve this matter. Instead, the question is whether the use of the leased premises as a parking lot constitutes a "use[ ] similar or related to the general scope of the described use" in the lease, *Bevy's Dry Cleaners and Shirt Laundry, Inc. v. Streble*, 2 Ohio St.2d at 254, 208 N.E.2d at 532, which is not injurious to the landlord. *Ewing*, 573 So.2d at 1369.[19]

 The Court finds that the parking lot is not similar or even closely related to use of the premises as either a service station or convenience store, or both. Additionally, as pointed out by the Pacieras, the City of Biloxi enacted a zoning ordinance in 1992 that reclassified the property at issue and did not allow the use of the property as a retail service station, although the site was "grandfathered in" as a non-conforming use.[20] However, because the service station was demolished and has not been used as such for a year, the site has lost its non-conforming use status under the zoning ordinance.[21] Therefore, the Pacieras have been injured to the extent that, when the lease terminates, they can not operate a service station site in an area where no other service stations are allowed by law.

TOCR's argument that the Pacieras have not been injured because they could have terminated their business and left the premises vacant until the end of the lease ignores Section 23–10–1 of the zoning ordinance, which provides that non-conforming use status will be lost if the premises remained vacant for a year.

 This conclusion does not conflict with the principle advanced by TOCR that,

absent a specific provision in the lease, there is no obligation of continued use by TOCR of the premises. *See Security Builders, Inc. v. Southwest Drug Company, Inc.*, 244 Miss. 877, 882, 147 So.2d 635, 637 (Miss.1962). First, for TOCR to be able to vacate and abandon the property but yet pay rent to the detriment of the Pacieras, as shown, would be contrary to Article III of the lease, which provides for the conduct of some type of business on the premises. Second, the actual holding in *Security Builders* was that specific performance for continued occupancy and use of a premises will not be available where the continued operation of the lessee's business would require "superintendence of the court." *Id.* at 885–86, 147 So.2d at 639. Third, in ruling on a petition to amend the judgment in *Security Builders*, the Mississippi Supreme Court declined to remand the matter for an assessment of damages because plaintiff failed to petition for an assessment of damages at the trial court. *Security Builders, Inc. v. Southwest Drug Co.*, 244 Miss. 877, 149 So.2d 319 (Miss.1963). In this case, the Pacieras have made a claim for damages for breach of contract.

Neither is *Kroger Co. v. Chimneyville Properties, Ltd.*, 784 F.Supp. 331 (S.D.Miss. 1991), also cited by TOCR, contrary to the Court's conclusion. There the district court did not consider whether an implied covenant of continuous operation could be read into the lease because the lease specifically provided for the possibility of the lessee's vacating the leased premises. *Id.* at 346–47. The lease at issue does not provide for the vacating of the premises by Tenneco or any sublessee.

### Conclusion

 The Pacieras are entitled to summary judgment because the use of the leased

---

**19.** To the extent that any of the cases cited by TOCR do not conform to this proposition, they are inapposite.

**20.** A copy of this zoning ordinance is attached to the Pacieras' motion for partial summary judgment, R.Doc. 22. Section 23–5–25(b), at CD23:54–55, lists the permitted uses for property located in the Waterfront District where the leased premises is located and does not include a retail service station. Service station use is only permitted in Light Industrial areas (Section 23–5–18(b)(37) at CD23:43–44).

Pursuant to Section 23–10–1, at CD23:76–77, the premises could have been used as a service station as a non-conforming use as long as there was no cessation of business as a service station for six months under Section 23–10–9, at CD23:78. (This last citation is attached to the Pacieras' Motion to Supplement Record, R.Doc. 33.)

**21.** *See* footnote 20.

premises as a parking lot is not a related or similar purpose to its former use under the lease as a service station/convenience store and, further, because the Pacieras have been injured through premises' loss of status as a non-conforming use under the Biloxi zoning ordinance. There is no genuine issue of material fact that the 1971 lease has been breached under applicable Mississippi law. *See* Fed.R.Civ.P. 56(c); *Little v. Liquid Air Corporation,* 37 F.3d 1069, 1075–76 (5th Cir. 1994). Hence, TOCR's cross-motion for partial summary fails.

Accordingly,

IT IS ORDERED that the "Motion for Partial Summary Judgment" filed by defendants and counterclaimants is GRANTED.

IT IS FURTHER ORDERED that the "Motion of for Partial Summary Judgment" filed by plaintiff is DENIED.